623 F.2d 422
 Fed. Sec. L. Rep. P 97,382
Mary Lillian ADAMS, in her own name and on behalf of all other persons
similarly situated, Plaintiffs-Appellees, Barry J. McKean,
et al., Paul W. Mankin, et al., Intervenors-Appellees,
v.
STANDARD KNITTING MILLS, INC., et al., Defendants,
Peat, Marwick, Mitchell and Company, Defendant-Appellant.
 Nos. 78-1111, 78-1112.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 22, 1979.
Decided May 2, 1980.
Rehearing and Rehearing En Banc Denied July 23, 1980.
 
 William E. Hegarty, Allen S. Joslyn, New York City, Donald F. Paine, Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for appellant in both cases.
 John M. Sikes, Jr., Zusman, Sikes, Prichard & Cohn, Atlanta, Ga., Milton J. Wallace, Wallace & Breslow, Miami, Fla., for Adams in both cases.
 Leon Jourolmon, Portland, Or., for McKean in both cases.
 Charles E. Rader, Knoxville, Tenn., for Mankin in both cases.
 Kenneth J. Bialkin, Louis A. Craco, Lawrence O. Kamin, New York City, for amicus curiae American Institute of Certified Public Accountants in both cases.
 Cahill, Gordon & Rindal, New York City, for appellant in 78-1112.
 Before WEICK, ENGEL and MERRITT, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this securities fraud case, Peat, Marwick, Mitchell & Co., herein referred to as "Peat," a firm of certified public accountants, appeals from a judgment of the District Court in the amount of $3.4 million, plus pre-judgment interest, plus attorneys' fees of.$1.2 million. The suit is a class action based upon causes of action implied under §§ 10(b)[1] and 14(a)[2] of the Securities Exchange Act of 1934 and SEC Rules 10b-5[3] and 14a-9.[4] It is based on an allegedly false proxy solicitation issued in order to gain shareholder approval of a merger between two corporations, Chadbourn, Inc. and Standard Knitting Mills, Inc., herein referred to as "Chadbourn" and "Standard." The primary issue is whether Peat is liable for a negligent error the failure to point out in the proxy statement sent to stockholders of the acquired corporation that certain restrictions on the payment of dividends by the acquiring corporation applied to preferred as well as common stock. We hold that in the context of this case Peat is not liable for such conduct and reverse the District Court on the issue of liability.
 
 
 2
 I. STATEMENT OF FACTS RESPECTING RESTRICTIONS ON PAYMENT OF DIVIDENDS
 
 A. General Terms and Purpose of the Merger
 
 3
 In April 1970, Chadbourn, Inc., a relatively profitable North Carolina hosiery manufacturer listed on the New York Stock Exchange, acquired all of the common stock of Standard Knitting Mills, Inc., a smaller, publicly-held, Knoxville, Tennessee, textile manufacturer, whose stock traded from time to time, although infrequently, in the over-the-counter market. On April 22, 1970, Standard's stockholders at a special meeting agreed to exchange their stock for a package of Chadbourn securities. The meeting occurred after the stockholders received the proxy statement a month earlier from Standard transmitting information about the proposed merger and Chadbourn's financial condition. The proxy statement contained a recommendation by Standard's management favoring the merger, as well as financial statements of Chadbourn prepared by its accountants, Peat Marwick.
 
 
 4
 Before the merger, Standard's stock traded at around $12.00 a share, although its book value was carried at approximately $21.00 a share, and Chadbourn's stock fluctuated between $8.00 and $14.00 a share. Standard's stockholders exchanged each share of Standard common for 1/10 of a share of Chadbourn common, plus 11/2 shares of Chadbourn convertible, cumulative, preferred stock. The Chadbourn preferred was the main part of the package. According to the terms of the merger agreement, each share of Chadbourn preferred stock given in exchange was supposed to pay annual cash dividends of $.462/3 a share, and Chadbourn was supposed to redeem 20% of these preferred shares each year at $11.00 a share, beginning in 1975. Each preferred share carried a conversion privilege allowing the preferred stockholder to convert a share of preferred into 6/10 of a share of Chadbourn common. The general purpose of the package appears to have been to give each Standard shareholder a set of Chadbourn securities with approximately the same market value as their Standard shares but with more liquidity and higher dividends.
 
 
 5
 Approximately a year after the merger, Chadbourn's sales of hosiery plummeted unexpectedly, and it suffered a loss of $17 million. This loss wiped out its retained earnings and left it with a capital deficit of $7 million. Chadbourn now was unable to redeem or pay dividends on the preferred stock. In October 1972, the former Standard stockholders sued Chadbourn, Standard, their management, their lawyers and the appellant, Peat, which was, as previously stated, the accounting firm that prepared and certified Chadbourn's financial statements in the proxy materials. Plaintiffs entered into a settlement agreement with the defendants other than Peat, under which the former Standard shareholders were awarded control of Chadbourn, renamed "Stanwood Corporation." The District Court did not take into account the value of the settlement received by the plaintiffs in determining damages against Peat. Since we reverse the findings of the District Court on liability, we need not reach questions concerning the measure of damages and the award of attorneys' fees.
 
 
 6
 B. Restrictions on the Use of Retained Earnings Contained in
 
 
 7
 the Chadbourn Loan Agreements
 
 
 8
 The first restriction on retained earnings is in a 5-year term loan agreement Chadbourn made with three banks in September, 1969. Chadbourn borrowed $6 million from the banks repayable in installments over the 5-year period. In order to protect the banks, the loan agreement contained a provision which prohibited Chadbourn and its subsidiaries in any year during the term of the loan from redeeming or paying dividends "on its capital shares of any class" in an amount in excess of $2 million, less the amount of the repayments on the loan, plus future earnings after the 1968-69 fiscal year.[5] These restrictions would apply to dividend payments on Chadbourn preferred shares issued to Standard shareholders (amounting annually to approximately $450,000) and would apply as well to any distributions to redeem these shares.
 
 
 9
 The second debt agreement was a little less restrictive. The second contractual restriction on paying out retained earnings is in another debt agreement which Chadbourn also entered into in 1969. Chadbourn borrowed $12.5 million in exchange for an issue of convertible, subordinated debentures. The effect of these restrictions on dividends and distributions was similar, except that under this agreement Chadbourn was free to use its 1968-69 net earnings of $3.1 million, as well as future earnings, for the payment of dividends and stock redemptions.
 
 
 10
 The net effect of both sets of restrictions on dividends and redemptions, when taken together, was that Chadbourn would either have to continue to make money or refinance its indebtedness in order to meet fully its future dividend and redemption obligations on the preferred stock issued to Standard's shareholders. As is explained above, when the bottom dropped out of its hosiery market and its retained earnings a year after the merger, it could do neither.
 
 
 11
 C. The Description of the Restrictions on Retained Earnings
 
 
 12
 in the Proxy Statement
 
 
 13
 Standard's proxy statement dated March 27, 1970, contained a 35-page description of the terms of the transaction and its tax-free nature, comparative earnings and stock prices of Standard and Chadbourn and a description of their history, business, managements and properties. The text was followed by 18 pages of financial statements of both companies, including the opinions of Peat with respect to the Chadbourn financial statements and of Ernst & Ernst with respect to the Standard financial statements.
 
 
 14
 The plan for the exchange of Standard stock for Chadbourn stock was set out at pages 4-8 of the text under the heading "SUMMARY OF PLAN." Pages 6-7 of this portion of the proxy statement accurately describe the two sets of restrictions as follows:
 
 
 15
 Under the provisions of a term loan with three banks maturing October 1, 1974, Chadbourn cannot, without the consent of such banks, (1) declare any dividend or (2) make any distribution (other than common stock dividends), or (3) acquire any of its stock if, after such action, the aggregate of all dividends (other then stock dividends), other distributions to stockholders and all amounts paid for the acquisition of its stock plus the amounts of all payments made on the term loan, would exceed $2,000,000 plus Chadbourn's consolidated net earnings since August 2, 1969. The Indenture dated as of March 15, 1969, hereinabove referred to contains certain restrictions on the payment of dividends on capital stock, however, such are less restrictive than those contained in the term loan agreement.
 
 
 16
 Chadbourn's financial statements as of August 2, 1969, and Peat's opinion, dated October 21, 1969, were published in the back of the March 27, 1970, Standard proxy statement. The liabilities and stockholders' equity side of the balance sheet was shown on page F-5 of the proxy statement. This page sets out amounts for current installments of long-term debt, the non-current portion of long-term debt, and "stockholders' equity," which referred in turn to certain notes, including footnote 7.
 
 
 17
 Footnote 7, paragraphs (c) and (d) erroneously described the two sets of restrictions as follows:
 
 
 18
 (c) As to the note payable to three banks, the Company has agreed to various restrictive provisions including those relating to maintenance of minimum stockholders' equity and working capital, the purchase, sale or encumbering of fixed assets, incurrance (sic) of indebtedness, the leasing of additional assets and the payment of dividends on common stock in excess of $2,000,000 plus earnings subsequent to August 2, 1969.
 
 
 19
 (d) . . . Further, the indenture has certain restrictive covenants but they are less restrictive than those contained in the note agreement with the three banks. (Emphasis added.)
 
 
 20
 The word "common" in paragraph (c) referring to the loan agreement was wrong because the relevant provision of the loan agreement restricted the use of retained earnings for the payment of dividends on "capital stock of any class," not just "common." Thus the restriction on retained earnings would apply to all distributions to pay dividends or redeem the preferred shares issued to Standard stockholders should they approve the merger.
 
 D. Facts Respecting Peat's Negligence
 
 21
 The facts demonstrate that Peat's omissions were the result of negligence but did not arise from an intent to deceive, or scienter, as found by the District Court.
 
 
 22
 Peat failed to disclose fully in the financial statement the restrictive effect of the loan agreement and indenture on Chadbourn preferred stock. After each entry relating to long-term capitalization, the financial statement directs the attention of the reader to explanatory note 7. Note 7 alone pertains to Chadbourn's long-term debt. Missing from the note is any reference to limitations that the debt agreements placed on Chadbourn preferred stock.
 
 
 23
 Only in notes 7(c) and 7(d) does Peat mention the restrictive provisions. Note 7(c), which discusses the loan agreement, reports only that "the Company has agreed to various restrictive provisions including . . . the payment of dividends on common stock in excess of $2 million plus earnings subsequent to August 2, 1969." Note 7(d) describes the indenture. It says that "the indenture has certain restrictive covenants, but they are less restrictive than those contained in the (loan) agreement." Thus, there is no indication in either note that the long-term debt restrictions affected the redemption and earnings of preferred stock.
 
 
 24
 From notes 7(c) and 7(d), a reader easily could derive the following mistaken impression: The loan agreement contains certain restrictions on the payment of dividends by Chadbourn. As note 7(c) explicitly says, the loan agreement restrictions relate to the payment of dividends "on common stock." The indenture contains limitations that are "less restrictive" than those created by the loan agreement. Since the limitations of the loan agreement apply only to common stock, the reader mistakenly could reason that the "less restrictive" indenture constraints appear to have no broader sweep. What note 7 conveys to the reader is the erroneous notion that neither the loan agreement nor the indenture restrictions apply to Chadbourn preferred stock.
 
 
 25
 The remainder of the proxy solicitation does not entirely correct the misunderstanding created by the financial statement notes. Peat argues that the textual language from the body of the proxy statement, quoted above in subsection C, adequately advised Standard shareholders that long-term debt agreements restricted certain aspects of Chadbourn's preferred stock. We conclude, however, that contrary to Peat's claim, the text is equivocal.
 
 
 26
 The text states that Chadbourn cannot "declare any dividends" or "make any distributions" under certain conditions specified by the loan agreement. These phrases are placed under the heading "The Chadbourn Common Stock." It would not be irrational to conclude from the location of these statements that the restrictions applied solely to the common stock of Chadbourn. This conclusion would be confirmed by note 7(c), which explicitly states that the loan agreement restricts the payment of dividends on common stock. Moreover, under the section of the text labelled "Provisions Relating to the $.462/3 Preferred Stock," there is no indication that any debt restrictions exist, much less that they apply to the dividends or redemption of preferred stock.
 
 
 27
 Nor does the language in the text regarding indenture restrictions correct the misleading impression of note 7(d). The text reports that the indenture contains "certain restrictions on the payment of dividends on capital stock." Like note 7(d), the text fails to mention restrictions on the redemption of Chadbourn preferred stock. The language regarding dividend payment restrictions on capital stock is found in the "Chadbourn Common Stock" section. Its location casts doubt on the argument that "capital stock," the restrictions on which are mentioned in part by the text, was meant in this context to include preferred stock. Adding to the doubt is the absence of any information about the indenture from the "Preferred Stock" section of the text. At best the textual discussion of indenture restrictions is equivocal regarding their reach.
 
 
 28
 The finding of the District Court that Peat acted with scienter in making the omissions is nevertheless clearly erroneous. We find in the record nothing to indicate that a desire to deceive, defraud or manipulate motivated Peat to omit from the financial statement information regarding the applicability of long-term debt restrictions. Indeed, Stanwood Corporation, the successor to Chadbourn controlled by the former Standard shareholders, hired and retained as vice president and treasurer the Peat associate, Hugh Freeze, who the shareholders' counsel now claim sought to defraud them. If the shareholders and their representatives really believed Freeze intended to defraud them, it seems doubtful that they would have put him in charge of the financial affairs of the corporation.
 
 
 29
 At most the evidence supports a finding that Peat acted negligently in preparing the financial statements. Peat became aware that note 7 incorrectly described the debt limitation several weeks before the merger vote occurred. The Standard proxy statement was mailed to its stockholders on March 27, 1970. Between March 23, 1970, and April 1, 1970, Chadbourn's outside counsel telephoned Freeze, the Peat manager in charge of the Chadbourn audit, and told him that a description of restrictions relating to Chadbourn's stock had been inserted in the forepart of the Standard proxy statement prior to mailing. The lawyer called to his attention the difference in the description in the proxy statement and the footnote, pointing out that the footnote said "common" rather than "capital stock of any class." In the course of this conversation, Freeze took a copy of the preliminary Standard proxy statement and noted the change by hand in note 7(c). Thereafter, footnote 7(c) was not amended, and no effort was made to call the discrepancy to the attention of Standard stockholders or officials. Freeze did not foresee that the bottom would drop out of Chadbourn's earnings and that what appeared to be a minor error at the time would become a major bone of contention.
 
 
 30
 The evidence simply suggests a mistake, an oversight, the failure to foresee a problem. We find nothing in the record indicating an intent to deceive or a motive for deception. J. B. Woolsey, Standard's vice president for financial affairs, and presumably other Standard officers, knew of the restrictions and recommended the merger anyway. No stockholder testified that he was deceived. An erroneous statement cannot ipso facto prove fraud, and here we find no evidence of anything other than a negligent error.
 
 
 31
 II. LIABILITY FOR NEGLIGENT MISREPRESENTATION UNDER SEC
 
 RULES 10b-5 and 14a-9
 
 32
 In view of our conclusion that the District Court's findings of scienter are clearly erroneous, we reverse the imposition of liability under Rule 10b-5. In Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court settled the issue. It unequivocably held that liability under Rule 10b-5 requires "intentional misconduct." Id. at 201, 96 S.Ct. at 1384. The Court said that 10b-5 requires "intentional or willful conduct designed to deceive or defraud investors." Id. at 199, 96 S.Ct. at 1384.
 
 
 33
 We turn to the question of the standard of liability under Rule 14a-9 pertaining to statements made in proxy solicitations. There has been relatively little case law on the standard of liability following the Supreme Court decision in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), which established a private right of action under 14(a) and Rule 14a-9. Two circuits have examined the issue. Both have prescribed a negligence standard for the corporation issuing the proxy statement. One held that the negligence standard also applies to outside, nonmanagement directors, Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 777-78 (3d Cir. 1976); and the other intimated in dicta, without deciding the issue, that a scienter standard probably should apply to outside directors and accountants, Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1300-1301 (2d Cir. 1973).
 
 
 34
 In view of the overall structure and collective legislative histories of the securities laws, as well as important policy considerations, we conclude that scienter should be an element of liability in private suits under the proxy provisions as they apply to outside accountants.
 
 
 35
 It is not simply a question of statutory interpretation. Federal courts created the private right of action under section 14, and they have a special responsibility to consider the consequences of their rulings and to mold liability fairly to reflect the circumstances of the parties. Although we are not called on in this case to decide the standard of liability of the corporate issuer of proxy material, we are influenced by the fact that the accountant here, unlike the corporate issuer, does not directly benefit from the proxy vote and is not in privity with the stockholder. Unlike the corporate issuer, the preparation of financial statements to be appended to proxies and other reports is the daily fare of accountants, and the accountant's potential liability for relatively minor mistakes would be enormous under a negligence standard. In contrast to section 12(2) of the 1933 Act which imposes liability for negligent misrepresentation in a prospectus, Rule 14a-9 does not require privity. In contrast to section 11 of the 1933 Act which imposes liability for negligent misrepresentation in registration statements, Rule 14a-9 does not require proof of actual investor reliance on the misrepresentation. Rule 14a-9, like 10b-5, substitutes the less exacting standard of materiality for reliance, TSC Ind., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and in the instant case there was no proof of investor reliance on the notes to the financial statements which erroneously described the restriction on payment of dividends. We can see no reason for a different standard of liability for accountants under the proxy provisions than under 10(b).[6]
 
 
 36
 We may not end our consideration there, however. We must turn to the legislative history of the proxy provisions. Section 14(a) and Rule 14a-9 are silent regarding the proper standard of liability. The Senate Report to the 1934 Act, commonly known as the Fletcher Report, discussed the sort of proxy abuse that Congress was trying to stop, that of corporate officers using the proxy mechanism to ratify their own frauds upon the shareholders, or outsiders soliciting shareholders' approval to plunder a ripe company. The Report cited one example, quoted below in the footnote.[7] The nature of each wrong deed depicted by the Report evidenced scienter.
 
 
 37
 An even more informative section of the Report is one describing the scope of 14(a):
 
 
 38
 It is contemplated that the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and, on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts. (emphasis added)
 
 
 39
 Senate Committee on Banking & Currency, S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934).
 
 
 40
 The words "unscrupulous," "concealing," and "distorting" all imply knowledge or scienter; and we interpret "promiscuous" to mean reckless. In addition the characterization of irresponsible outsiders trying to "wrest control . . . from honest . . . corporate officials," implies dishonesty and hence scienter on the part of the outsiders. Consequently, the Report leads us to believe that its authors contemplated that 14(a) would be applied only against the knowing or reckless wrongdoing of outsiders.
 
 
 41
 The few times the proxy section was discussed in debate paint a similar picture of the type of misconduct against which 14(a) was directed. Roosevelt's aide, Corcoran, who drafted the original version of the 1934 Act, spoke of "unscrupulous proxy committees" (emphasis added). See 78 Cong.Rec. 6544 (1934). Everett Dirksen, then a Representative from Illinois, stated, "(t)here is little doubt that there has been grave abuse of this authority to solicit proxies and the use of such proxies for manipulation " (emphasis added) 78 Cong.Rec. 7961 (1934). Further debate indicates Congress' concern that directors and officers should not be able to complete their fraud upon a company by means of a proxy solicitation that seeks ratification of their illegal acts. See 78 Cong.Rec. 7712-14 (1934). Congressman Pettengill of Indiana stated during Committee hearings exactly what he thought such undesirable activity amounted to: "larceny." See Hearings on H.R. 7852 Before the House Comm. on Interstate & Foreign Commerce, 73d Cong., 2d Sess. 480 (1934). The common denominator of all these depictions of the problem is wrongdoing with some degree of knowledge, i. e. scienter; and nowhere, not in the committee reports nor in the House or Senate debates, does it appear that Congress desired to protect the investor against negligence of accountants as well.
 
 
 42
 Another important consideration is Congressional intent regarding subsequent amendments that are indirectly linked to 14(a). In passing the Williams Act of 1968[8] governing tender offers, Congress expressed the desire that proxy statements and tender offers be governed by the same rules and regulations. This would logically extend to standards of liability. Because 14(e)[9] pertaining to tender offers requires scienter, we believe there is a strong policy reason for imposing a similar standard on 14(a).
 
 
 43
 According to the House Report for the Williams Act, "(t)he cash tender offer is similar to a proxy contest, and the committee could find no reason to continue the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions." H.R.Rep. No. 1711, 90th Cong., 2d Sess., reprinted in (1968) U.S.Code Cong. & Admin.News 2811, 2813. Tender offers and proxy solicitations are two alternative methods of achieving the same result, corporate control; and Congress perceived that both were subject to the same type of abuse. It therefore acted to eliminate an existing loophole in the old law so that wrongful usurpation of control would not escape securities regulation whenever one combatant chooses to seize control by tender offer rather than by proxy fight. Id.
 
 
 44
 Senator Williams of New Jersey, the sponsor of the bill, stated
 
 
 45
 What this bill would do is to provide the same kind of disclosure requirements which now exist, for example, in contests through proxies for controlling ownership in a company. (emphasis added)
 
 
 46
 113 Cong.Rec. 24665 (1967).
 
 
 47
 Senator Javits echoed this view.
 
 
 48
 The Senator (Williams) represents to the Senate, and I accept his representation fully, that this is analogous to the proxy rules. Id.
 
 
 49
 And Senator Williams repeated that "(t)his legislation is patterned on the present law and regulations which govern proxy contests." Id. Logically the above testimony implies similar standards of liability for both proxy statements and tender offers. Otherwise some misleading solicitations which would trigger liability if shaped in the form of one transaction, would be immune if shaped as the other, or vice versa.
 
 
 50
 The language of the Williams Act clearly demonstrates that Congress envisioned scienter to be an element of 14(e). Congress used the words "fraudulent," "deceptive," and "manipulative." This language indicates, in light of Ernst & Ernst, that 14(e) requires scienter. Although Ernst & Ernst was decided several years after the enactment of 14(e), we are bound by its holding that Congress intends scienter when it uses the above quoted language.
 
 
 51
 We conclude that 14(a) and 14(e) should be governed by the same standard of liability insofar as accountants' liability is concerned, and that an action under 14(a) requires proof of scienter. Finding no evidence of scienter, we reverse the imposition of liability under 14(a) and Rule 14a-9.
 
 III. COMPUTER DEFECTS
 
 52
 Chadbourn used electronic data processing to record many of its financial records from sales to inventory on hand. The District Court found various deficiencies connected with these computer accounts which, it concluded, Peat should have disclosed in the notes accompanying the proxy statement.
 
 
 53
 The record contains evidence of poorly documented computer programs, a high level of computer personnel turnover, lack of security in the computer room, erroneously coded data, and poorly designed computer programs that failed to detect improperly coded data. Peat sent several memoranda to Chadbourn's management, documenting the computer weaknesses; and one internal Chadbourn memorandum not written by Peat, stated that the company was "pushed . . . to the brink of bankruptcy" by the unreliability of computer-generated information. The District Court found that Peat's failure to disclose these weaknesses constituted fraud. We disagree.
 
 
 54
 An outside accountant examines the quality of a company's internal accounting primarily to determine the extent to which he must test a client's records. The more reliable the client's accounting system proves to be, the less testing the accountant must conduct. A by-product of this testing is the discovery of weaknesses in internal accounting. The accountant may bring such weaknesses to the attention of management but he is not always obligated to inform the stockholders. This is not to say that an accountant may keep a blind eye to all wrongdoing while walking through a client's corporate headquarters. He may be held liable to the extent that he intentionally or recklessly disregards the generally accepted, standard body of accounting knowledge. This is not the case here. Although we cannot say the District Court's inference, that faulty computer information materially impaired management's ability to manage, is clearly erroneous, there was no scienter in Peat's failure to disclose. The absence of an intent to deceive is fatal to plaintiff's claim.
 
 
 55
 According to the Statements on Auditing Procedure,[10] promulgated by the Auditing Standards Executive Committee of the American Institute of Certified Public Accountants (AICPA), the accountant may have a duty to direct management's attention to internal accounting weaknesses he has uncovered. But the Committee imposed no requirement that the notes to the certification of financial reports contain a similar disclosure of such weaknesses.
 
 
 56
 An auditor cannot always make an assessment of the effect of accounting weaknesses on the efficiency of a company. Often such an assessment requires a technical knowledge of a business in which accountants have no expertise. Peat's reliance on the AICPA's committee opinions is sufficient indication of good faith and lack of scienter.
 
 
 57
 Peat cannot be charged with knowledge of the interplay between poor or inefficient record-keeping procedures and mismanagement. Nor does the record disclose that Peat actually knew of Chadbourn's internal memoranda evaluating the effect of poor computer information upon management. Likewise, the evidence does not support a finding of recklessness.
 
 
 58
 Finally, undisputed testimony shows that by the time of the proxy solicitations, many of the computer problems had already been solved. The only relevant disclosure would have been that, for the two quarters preceding the merger, Chadbourn's management may not have been sufficiently informed due to temporary computer deficiencies. Accountants are not liable for failing to speculate publicly about this subject.
 
 IV. THE AUDIT
 
 59
 The District Judge also held that Peat failed to conduct its audit according to generally accepted accounting principles (GAAP) and generally accepted auditing standards (GAAS), and therefore fraudulently misrepresented material facts about Chadbourn by certifying the proxy financial statements. The Court found deficiencies in two important areas of the audit, the closing inventory and accounts receivable. We conclude that there is sufficient evidence to support the Court's finding that Peat inadequately tested Chadbourn's financial figures in certain respects, but the evidence falls far short of proving that Peat intended to deceive the stockholders or that its negligence produced financial statements materially at odds with the real facts. The question of materiality in this context is whether, given all the financial information, there was a substantial risk that the actual value of assets or profits were significantly less than Peat stated them to be.
 
 
 60
 The District Judge found errors in five aspects of the inventory valuation: the physical count, the standard cost audit, the conversion from standard to actual costs, the inventory "work forward," and the "lower of cost or market" test. An accurate appraisal of inventory is important in a business such as Chadbourn's because, aside from exaggerating the primary asset listed on the balance sheet, overvaluing the closing inventory lowers the annual cost of sales and thus inflates net earnings.[11] This latter figure is especially sensitive to fluctuation in inventory value when inventory value is disproportionately greater.
 
 1. Physical Count
 
 61
 In conducting a physical inventory, independent accountants do not count every item on their client's premises. The client's employees count inventory items, and usually these counts are documented on accounting forms or "tickets" as to style, quantity, as well as other relevant characteristics. The accountant's responsibility is to conduct statistical tests on a cross-section of these accounting tickets to determine whether the client counts were correct. The client counts need not exactly coincide with the accountant's spot check count, as long as the percentage of discrepancies to total number of goods, is small.
 
 
 62
 The District Court found that Peat conducted inadequate tests for counts of both finished stockings and greige goods.[12] The finding regarding greige goods is based on testimony by witness Rittenberg that from a total of 1000 to 1500 bins of goods, a Peat employee tested about 100, and that the Peat count on items inside each bin conflicted with Chadbourn's in 40 to 50 of the bins tested. In examining the exhibit from which Rittenberg drew his conclusion, we calculate for the bins tested that the average variance between Peat's and Chadbourn's count, weighted by the total number of goods, was only about four percent. The greige good inventory, as a whole, was valued at $2 million. This degree of variance in the greige good account is insufficient to render the inventory figure a material misstatement of fact.
 
 
 63
 The District Judge's finding regarding the count of finished goods was based on cross examination testimony of Peat's accountant, William Brasington. After selecting four work papers, Brasington stated that, for one ticket listing representing 199,000 dozen, one style consisting of 1655 dozen was tested and a difference of 28 dozen was found. He "admitted" that this test by itself would have been insufficient but claimed that other testing was done. He also testified that in another instance, a count of 435,000 dozen was not tested at all. It is not a reasonable conclusion, however, that the total amount of testing was insufficient.
 
 
 64
 Brasington vigorously insisted that on the whole testing was adequate. The Record does not indicate the total number of discrepancies found in either Brasington's four work papers or all the work papers combined. Nor does it indicate for what purpose Brasington was asked to select these four work papers. No expert witness claimed that the testing of the physical count was insufficient. Plaintiff's chief witness concerning the audit, Larry Rittenberg, examined Peat's work papers and testified in lengthy detail to the errors and omissions in Peat's work. He did not testify that there were any errors in the physical count.
 
 
 65
 The District Judge inferred from the counts of the two inventory items that were not fully tested, and from Brasington's failure to produce other work papers, that all the work papers relating to the physical count were deficient. But the record does not show that the four work papers were deficient on the whole.
 
 
 66
 The four papers were only a part of the testing of the total count. In order to determine whether the testing was deficient there must be evidence from a large enough sample of work papers from which a statistically valid conclusion about the whole may be drawn. The evidence does not support a conclusion that there was a material miscount in these inventory items.
 
 
 67
 Third, the District Judge found that Peat did not adequately test a computer listing of finished goods that was compiled from the accounting tickets. The testimony cited by the District Court was again taken from the cross examination of Brasington. Brasington said that 5 percent of the listings were tested and that 1 to 2 percent error was found. The District Court evidently interpreted the witness to mean that of the 5 percent tested, 1/5 to 2/5 of the listings were wrong. What the witness clearly meant, however, was that 1 to 2 percent of the sample tested were inaccurate, and interpolating this 5 percent sample to the whole, that 1 to 2 percent of the entire listing might have been inaccurate. This small error is immaterial and supports the validity of Peat's testing.
 
 
 68
 The District Judge also found that Peat conducted insufficient cut-off tests. A cut-off test is one designed to tag inventory at the plant at which it was first counted so that it is not counted twice if shipped to another plant. The record does not indicate, however, that this affected a material portion of goods.
 
 2. Standard Cost Audit
 
 69
 Next plaintiffs contend that Peat did not test Chadbourn's "build-up" of standard costs. A build-up of standard costs involves an estimate of costs per unit of goods; it starts with production records or engineering studies on the costs of labor and raw materials per good. The costs are totalled and checked style by style for consistency. The "build-up" represents what it should cost to produce goods under realistic day-to-day manufacturing circumstances barring unusual, unforeseen, and evanescent occurrences. Determining standard cost is a method of allocating total actual costs among different styles, and is an intermediate step in valuing the actual cost of the closing inventory.
 
 
 70
 The District Court found that Peat's testing of the standard cost build-up was not documented in its work papers, and concluded that Peat never audited the standard cost at all. Plaintiffs have not proved, however, that there was a material risk that a proper audit of the standard cost system would have revealed materially lower costs. Indeed, the evidence tends to support Peat's valuation. Actual costs were extremely close and slightly higher than the estimated standard cost, a prima facie indication of a relatively small risk that standard costs were materially lower. Nor does the record indicate unusual circumstances that unduly inflated actual production costs.
 
 
 71
 In the unlikely event that standard costs for some styles were materially lower, standard costs for other items must have been higher in order for the sum of standard costs to have approached the actual cost so closely.[13] And in order for this mix of under and overvalued standard costs to have effected a material change in the valuation of the closing inventory, plaintiff must show that disproportionately more "overvalued" cost items than "undervalued" cost items were not sold and remained in the closing inventory. Consequently, even assuming Peat did not conduct further testing that the work papers directly indicate, this omission was immaterial. Moreover, there is a total absence of evidence of fraudulent intent.
 
 3. Conversion of Standard to Actual Costs
 
 72
 A third complaint is that Peat knowingly failed to establish standard cost centers for each plant, from which standard costs would be converted to actual costs on a plantwide basis. Instead, Peat computed a weighted average variance between what it perceived to be the actual-to-standard variances for each plant, and then used one company-wide average variance to convert each good's standard cost to its actual cost. The District Judge found on the basis of Rittenberg's testimony that this procedure violated both GAAS and GAAP. Whether or not this finding was clearly erroneous, plaintiff's chief witness specifically refused to conclude that there was a material risk that Peat's calculations thereby inflated the value of the closing inventory.
 
 
 73
 A plantwide "standard-to-actual" variance would be computed and utilized in valuing the entire company's inventory, only if there were an overall write-down from actual cost to market value in at least one plant. In order for Peat's method of calculation to result in an inflated valuation, plaintiffs must prove (1) that there had been an overwhelming concentration of goods whose actual cost exceeded market value in plants which had above average actual-to-standard variances, and (2) that there was no overall concentration of such goods in the other plants. There is no evidence that such circumstances occurred, and again, the information on which Rittenberg based his opinions could not have provided an adequate foundation for finding a material risk.
 
 4. Inventory Work Forward
 
 74
 Peat observed the inventory approximately four weeks prior to the end of Chadbourn's fiscal year. Peat updated the inventory to its status as of the fiscal year's end, using computer-generated data on sales transacted (the "gross profit report") subsequent to the taking of the physical inventory. The District Judge found that Peat's reliance on Chadbourn's computer system with all its weaknesses constituted a departure from GAAS, and therefore made its certification a material misrepresentation.
 
 
 75
 Of the long list of deficiencies the most relevant one was that "approximately 25% of customer service source documents (were) incorrectly coded." Testimony by Dalton, the head of Chadbourn's computer operations, indicates that a significant portion of the incorrect coding was of style number. This same style coding was used by the "gross profit report" program to retrieve individual costs for each item sold. This cost information was in turn used by Peat in its inventory work forward. If styles were incorrectly coded, this program which matched up styles with their respective costs would have been unable, by itself, to register the transaction correctly. But we cannot determine whether it would necessarily have provided an erroneous cost.
 
 
 76
 The District Judge found that Peat did not test the sales data for the work forward; this finding is not clearly erroneous. There is hearsay testimony that Peat conducted such tests in September or October of 1968, several months before the memo documenting the 25% error rate in coding. The District Judge evidently inferred from Peat's failure to document such testing in its workpapers, that the testing did not occur. The record also establishes adequate foundation for this inference.
 
 
 77
 Without examining the computer program documentation and procedures used by Chadbourn's computer operators for erroneously coded data, or conducting a test of the gross profit report data, Peat did not have any basis to evaluate the risk involved in using the reports. Although witness Rittenberg had no foundation to evaluate and testify on the risks either, we believe it is true that Peat conducted no testing on reports which dealt with $2 million in sales costs. The distinction here is between inadequate testing and no testing at all. The risk that 25% percent of styles were incorrectly coded presented the risk that the costs of 25% percent of the month's cost transactions totaling $2 million were incorrectly stated. Although the failure here could lead to a material error, there is no evidence that it did and certainly no evidence of scienter.
 
 5. "Lower of Cost or Market" Test
 
 78
 The final step in valuing a physical inventory is the markdown of items whose actual cost exceeds market value. The auditor must test a sampling of sales to determine whether its client has provided adequate reserves and hence an adequate markdown in inventory value for goods that are selling below cost. This is done in order to realize losses in inventory value as soon as they occur.
 
 
 79
 The District Judge found that Peat examined an insufficient number of sales to test Chadbourn's reserves. This is supported by Rittenberg's testimony. However, Brasington, one of Peat's accountants, gave uncontradicted testimony that the valuations proved to be correct from subsequent market studies on individual styles. Subsequent valuations would not have been so close to Peat's original predictions for so many different styles, had Peat's testing been materially inadequate. The District Judge's finding here is clearly erroneous.
 
 6. Accounts Receivable
 
 80
 Finally, the District Judge found that Peat failed to "reconcile" confirmations taken at different dates of Chadbourn's accounts receivable. A confirmation of an account receivable is simply a test of whether as of a certain date a customer of Chadbourn actually owes what Chadbourn's records show them to owe. Peat claims that the confirmation tests were adequate because in all, over 80% of accounts were tested. But Peat misunderstands the thrust of the Court's finding. When an accountant does not "reconcile" tests conducted on different dates, this leaves open the possibility that a customer who apparently is acknowledging an old debt, may actually be acknowledging a new one acquired between the two test periods. All confirmations must be confirmations of debts incurred as of a specific date.
 
 
 81
 The District Judge's finding that these tests were not reconciled is not clearly erroneous. Accounts receivable was listed as approximately $10 million or 15% of total assets of $65 million, and is therefore a material asset. The record, however, is silent on the magnitude of error that could have resulted from conducting confirmation tests on different but relatively close dates. It is improbable and there is no evidence that customers' debts increased so radically over a one month period to have materially altered Chadbourn's total accounts receivable. Consequently, plaintiffs have not shown Peat's failure to reconcile dates to have been material.
 
 
 82
 Accordingly, the judgment of the District Court is reversed.
 
 
 83
 WEICK, Circuit Judge, dissenting.
 
 
 84
 The complaint in this case was filed on October 12, 1972, in the United States District Court for the Eastern District of Tennessee, Northern Division at Knoxville.
 
 
 85
 Honorable Robert L. Taylor, who had been serving with distinction as a judge of the court for many years since his appointment to the bench on March 9, 1950, recused himself. Chief Justice Burger designated Honorable George Boldt, Senior District Judge of the Western District of Washington to serve in the place of Judge Taylor and to preside over this case. Judge Boldt accepted the designation. Judge Boldt, like Judge Taylor, had served with distinction since his appointment to the federal bench on July 27, 1953. He became Chief Judge on March 1, 1971 and Senior Judge on October 30, 1971. While engaged in the practice of law, he served as Assistant Attorney General of the State of Washington 1940-41 and 1946-1947. He was a Lieutenant Colonel in the United States Army, 1942-1945. He served as Chairman of the Pay Board, United States Economic Stabilization Program, 1971-1973. He served on the Judicial Conference Committee on Criminal Law, 1955-1965; the Coordinating Committee on Multi-District Litigation 1962-1970; the Committee on Multi-District Litigation, 1962-1972; the Committee on Rules of Procedure and Practice, 1960-1972; the Advisory Committee on Appellate Rules since 1973. It would appear that Judge Boldt, because of his vast experience as a trial judge and public service, was eminently well-qualified to try this case and certainly was not a novice. His qualifications are mentioned particularly because, in my opinion, the majority has usurped the fact finding functions of Judge Boldt, who did not deserve that treatment. It was not the province of an appellate court to review the factual findings of a trial judge de novo which is exactly what the majority did in the present case in many instances by stating that they were clearly erroneous when indeed they were not clearly erroneous, but were supported by substantial evidence, the testimony of many witnesses, including expert witnesses, depositions and credibility assessments made by the judge.
 
 
 86
 The majority obviously did not follow the standards mandated by the Supreme Court in Zenith Corporation v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576-1577, 23 L.Ed.2d 129 (1969), where the court in an opinion written by Mr. Justice White stated:
 
 
 87
 In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether "on the entire evidence (it) is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, (68 S.Ct. 525, 542, 92 L.Ed. 746) (1948). See also United States v. National Assn. of Real Estate Boards, 339 U.S. 485, 495-496 (70 S.Ct. 711, 717, 94 L.Ed. 1007) (1950); Commissioner v. Duberstein, 363 U.S. 278, 289-291 (80 S.Ct. 1190, 1198-1199, 4 L.Ed.2d 1218) (1960).
 
 
 88
 Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." Bigelow v. RKO Pictures, Inc., supra, (327 U.S. 251) at 264, (66 S.Ct. 574 at 579, 90 L.Ed. 652). See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 377-379 (47 S.Ct. 400, 404-405, 71 L.Ed. 684) (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561-566 (51 S.Ct. 248, 250-251, 75 L.Ed. 544) (1931).
 
 
 89
 See also Strickler v. Pfister Associated Growers, Inc., 319 F.2d 788, 790 (6th Cir. 1963).
 
 
 90
 As will be pointed out later, this decision is not the only decision of the Supreme Court which a majority of this panel did not follow.
 
 
 91
 The District Court, after an extensive trial, following discovery and many proceedings in this complex case, filed its "Memorandum Decision" and also "Findings of Fact and Conclusions of Law." It specifically found that Peat had prepared a proxy statement which contained false and misleading financial statements which proxy statement was to be used in connection with the acquisition of Standard Knitting Mills, Inc. (Standard) a Tennessee corporation, by Chadbourn, Inc., (Chadbourn) a North Carolina corporation, to induce the shareholders of Standard to vote in favor of said merger and to be filed with the SEC.
 
 
 92
 The Court found that Peat had acted "willfully, with intent to 'deceive' and 'manipulate' and 'in reckless disregard of the truth.' " The Court further found that Peat's certificate of an audit of Chadbourn was false and untrue. Because of these findings the Court determined that Peat had violated the Act and said Rules of the Commission.
 
 
 93
 Peat has appealed to this Court, filing a brief in chief containing 124 pages and a reply brief containing 54 pages, both briefs raising a myriad of questions. A brief of 122 pages was filed by the plaintiff's class, and briefs by sub-class and intervenors were filed and an amicus brief by American Institute of Certified Public Accountants was filed. In addition, eight large volumes of joint appendices have been filed containing various proceedings, transcripts of evidence at the trial, depositions and exhibits.
 
 
 94
 In this appeal, as before stated, it was not our function to conduct a de novo hearing. In an action involving claims of fraud, securities violations, and reckless conduct where the testimony at a bench trial was taken before an experienced District Judge who had the opportunity to and did take testimony of witnesses, observe the demeanor of the witnesses and to make credibility assessments, we are not permitted to set aside his factual findings unless we are satisfied and can demonstrate that they are not supported by substantial evidence and are clearly erroneous. Fed.R.Civ.P. 52(a). The majority was unable to demonstrate that the District Judge did not have sufficient evidence to support his findings of intentional fraud or reckless conduct.
 
 
 95
 In my opinion, the findings of fact adopted by the District Court are supported by substantial evidence and are not clearly erroneous. I would affirm the judgment of the District Court for the reasons herein set forth.I.
 
 
 96
 In 1969 Chadbourn, a moderately sized Charlotte, North Carolina manufacturer of hosiery and panty hose, enjoyed substantial sales due to the popularity of panty hose, its major product. Between 1967 and 1969 Chadbourn's earnings had increased many times. For the year ending August 2, 1969, it had sales of $68,074,688 and its 3,800,000 shares were listed on the New York Stock Exchange. During this period the market for panty hose was free of foreign competition and price cutting. In the late 60's Chadbourn embarked upon an aggressive acquisition campaign.
 
 
 97
 In 1968 and in early 1969 Chadbourn became interested in acquiring Standard Knitting Mills of Knoxville, Tennessee. Standard was a relatively small company whose shares of stock were owned and controlled by Knoxville residents. Its 632,000 shares of common stock were registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 and were publicly held by 556 persons and were seldom traded. The sales price of the few shares that did change hands was roughly at $11 a share. Twenty-two percent of its stock was held and controlled by Valley Fidelity Bank and Trust Company of Knoxville in a number of fiduciary accounts. Nineteen percent was held or controlled by officers and directors of Standard and their families. The officers and directors of Standard were considered to be substantial people in Knoxville. Although many of its plants were old, it had for many years run a sound business and paid dividends by manufacturing cotton knitwear. In the late 60's three large chain store customers bought approximately 50 percent of its output.
 
 
 98
 Prior to the merger and during the period of negotiation for the shares of Standard, Chadbourn offered for sale to its shareholders and to the public $12,631,000 of 61/2 percent 20 year convertible subordinated debentures due March 15, 1989 pursuant to an Indenture dated March 15, 1969.
 
 
 99
 On July 28, 1969, Chadbourn and Standard agreed to merge subject to a vote of approval by the Standard shareholders which vote eventually took place at a special meeting of its shareholders held on April 22, 1970. In return for each share of Standard stock Standard shareholders were to receive one and one half shares of Chadbourn $.462/3 Cumulative and Convertible Preferred Stock, Jr., Series A, created specifically for the purpose of consummating the Standard merger. In addition, Chadbourn specifically agreed to repurchase the preferred from shareholders of Standard who desired to sell at $11 per share in five yearly installments from 1975 to 1979.
 
 
 100
 As a result of the merger, Chadbourn acquired a relatively conservative textile manufacturing company that was well entrenched in the Knoxville community. For many years Standard had operated as a sound business enterprise, and indeed, it reported its first operating loss in recent history in the months just prior to the merger with Chadbourn, and also reported earnings weakness for the period immediately after the merger. Three of its customers were large chain stores that were valuable clients. The $.462/3 dividend, $10 par cumulative convertible preferred financed the acquisition by Chadbourn without any immediate outlay of a large sum of money. Chadbourn thus obtained beneficial control of the company and its earning power. Further, Chadbourn did not need to resort to a bank or to the competitive money markets for financing the merger at a high rate of interest which allowed it to use any bank credit that was available to it for other purposes. Because of the relatively small dividend the most valuable feature of the preferred was its ability to be converted into .6 share of Chadbourn common which fluctuated in value between $8 and $14 per share before the merger. From the point of view of the plaintiff class and sub-class, former Standard common shareholders, the merger offered some advantages. In return for their common, plaintiffs were to receive cumulative preferred dividends larger than dividends declared historically on Standard common, each share of preferred was convertible into Chadbourn common, the preferred was readily marketable on the New York Stock Exchange for cash, a small amount of Chadbourn common would be distributed pro rata among holders of the preferred if Standard achieved certain earnings goals, and Chadbourn promised to redeem the preferred at $11 per share in installments from 1975 to 1979 to shareholders desiring redemption.
 
 
 101
 In September, 1969, approximately two months after the agreement to merge was signed but before it was approved by Standard's shareholders, Chadbourn borrowed six million dollars from North Carolina National Bank, First National Bank of Boston, and the First National Bank of Atlanta. The loan agreement called for twenty consecutive quarterly installment payments of $150,000 and a final lump sum payment of any remaining balance so that the entire loan would be retired on October 1, 1974, if the payments were made several months before Chadbourn agreed to begin redeeming the preferred stock.
 
 
 102
 An internal Peat memorandum acknowledged on July 24, 1969, the engagement of its services by Chadbourn in preparing a "(p)roxy statement to be filed (with the SEC) for stockholders of Standard Knitting Mills, Inc. in connection with the proposed acquisition of Standard and its subsidiaries by Chadbourn." It was also to be used to solicit votes of Standard shareholders favoring the proposed merger. Peat made the audit during the July 4th 1969 holiday as was customary in the textile industry. It was ultimately dated August 2, 1969.
 
 
 103
 Peat received $194,424 for its services from Chadbourn in 1969-70. Peat charged $105,000 for the audit and $26,000 for the Standard proxy work. Peat charged a fee that was 125% of its usual fee because "SEC work does require a higher degree of risk," however, Peat admits that it exercised no different degree of care in performing its services for Chadbourn.
 
 
 104
 The Standard proxy materials in issue were mailed to Standard shareholders on March 27, 1970. The merger was approved by the shareholders at a special meeting for that purpose held on April 22, 1970. At the meeting Mr. Kramer, General Counsel and a Director of Standard, represented that there were no restrictions on the payment of dividends on the $.462/3 cumulative and convertible preferred. This representation conformed to Footnote 7 of the Chadbourn financial statement contained in Standard proxy materials which was written and certified as correct by Peat. Footnote 7 in pertinent part reads as follows:
 
 
 105
 (7) Long-Term Debt:
 
 
 106
 (c) As to the note payable to three banks, the Company has agreed to various restrictive provisions including those relating to maintenance of minimum stockholders' equity and working capital, the purchase, sale or encumbering of fixed assets, incurrence of indebtedness, the leasing of additional assets and the payment of dividends on common stock in excess of $2,000,000 plus earnings subsequent to August 2, 1969.
 
 
 107
 (d) The 6% debentures are . . .
 
 
 108
 Further, the indenture has certain restrictive covenants but they are less restrictive than those contained in the note agreement with the three banks. (Emphasis ours)
 
 
 109
 The footnote incorrectly stated that the restriction upon the payment of dividends contained in the bank loan agreement applied only to Chadbourn common stock. Further, the exact provisions of the restrictive covenants of the Indenture are not set out but are characterized as "less restrictive than those contained in the note agreement with the three banks," implying that only restrictions on payment of dividends on common were contained in the Indenture. There is no mention of restrictions on the payment of dividends on Chadbourn preferred stock contained in the bank loan agreement or the Indenture, and there is no mention whatsoever of any restrictions on redemption of the preferred stock contained in either the bank loan agreement or the Indenture.
 
 
 110
 Approximately one month after the merger was approved plaintiffs received a proxy from Chadbourn soliciting their votes for approval of a loan and option agreement involving the acquisition of United Hosiery Mills by Chadbourn (the UHM proxy materials). Footnote 7(c) of the financial statement in the UHM proxy materials, which corresponded to footnote 7(c) contained in the Standard proxy materials, supra, had been altered so that the word "common" hereinbefore referred to was changed to the word "capital," thus indicating that restrictions on payment of dividends contained in the bank loan agreement applied to both common and preferred stock. This change was not brought to the attention of the reader in Peat's certification of the Chadbourn financial statement contained in the UHM proxy materials and the change was located on the 55th page of 77 pages of the UHM proxy materials.
 
 
 111
 Several months after plaintiffs received the UHM proxy materials plaintiffs received the 1970 Chadbourn Annual Report, which contained a financial statement for Chadbourn prepared by Peat. Footnote 6(c) of this financial statement returned to the use of the word "common." A quick reference to the 1969 Chadbourn Annual Report for the purpose of resolving this ambiguity would reveal that the pertinent footnote in the 1969 Chadbourn Annual Report used the word "common" as well. Footnote 7(c) in the UHM materials, therefore, was the only footnote in the certified financial statements in issue received by plaintiffs which indicated that restrictions on the payment of dividends in the bank loan agreement and Indenture applied to both common stock and preferred stock. The 1969 Chadbourn Annual Report, the financial statement in the Standard proxy materials, and the 1970 Chadbourn Annual Report uniformly indicated that the restrictions on the payment of dividends applied to common stock only, and none of the financial statements in issue, including the one in the UHM proxy materials, mentioned any existence of restrictions upon redemption contained in the bank loan agreement and the Indenture.
 
 
 112
 The loan agreement and the Indenture in fact contained covenants which restricted the payment of dividends upon common and preferred stock and the redemption of common and preferred stock. The bank loan agreement in pertinent part provided that Chadbourn would not:
 
 
 113
 5.3 Declare or pay any dividend on its capital shares of any class or make any distribution to any shareholders as such (other than dividends or distributions payable solely in common stock of the Company and other than cash paid in lieu of fractional shares in connection with any such dividend payable solely in common stock of the Company), or purchase, redeem or otherwise acquire for value any shares of its stock of any class, if, after giving effect to such action, the aggregate of:
 
 
 114
 (a) all dividends, other than in common stock of the Company, on its capital shares of all classes, preferred and common, and all other distributions to shareholders as such (other than cash paid in lieu of fractional shares in connection with any dividend payable solely in common stock of the Company) between August 2, 1969 and the time of taking such action; plus
 
 
 115
 (b) all amounts paid out for any redemptions, purchases or other acquisitions of its stock of any class (other than amounts for redemption of any shares of the Company's 6% Cumulative Preferred Stock, $50 par value) between August 2, 1969 and the time of taking such action; plus
 
 
 116
 (c) the amount of all payments required to be made, and of all prepayments made, on principal of the Note prior to the time of taking such action;
 
 
 117
 would exceed the sum of:
 
 
 118
 (y) $2,000,000; plus
 
 
 119
 (z) the consolidated net earnings (including special items) of the Company and its subsidiaries accumulated subsequent to August 2, 1969;
 
 
 120
 provided that any subsidiary may declare and pay dividends.
 
 
 121
 The pertinent text of the Indenture is less precise. The text in pertinent part reads as follows:Section 5.05. The Company will not declare or pay any dividends or make any distribution on or with respect to its capital stock, except for dividends payable solely in capital stock of the Company and except for cash paid in lieu of fractional shares in connection with any such dividend payable solely in capital stock of the Company, and will not permit any subsidiary to, directly or indirectly purchase, redeem, or otherwise acquire for a consideration any capital stock of the Company if the aggregate amount of all such payments or distributions after August 3, 1968 would exceed the sum of
 
 
 122
 (i) $2,000,000 plus
 
 
 123
 (ii) the net proceeds (exclusive of any underwriting discounts or commissions or other expenses paid or incurred by the Company in connection therewith) of the sale for cash by the Company of any shares of its capital stock after August 3, 1968 less the amount paid by the Company for the purchase with cash of any shares of its capital stock after August 3, 1968 plus
 
 
 124
 (iii) Consolidated Net Income realized after August 3, 1968.
 
 
 125
 Consolidated Net Income from August 3, 1968, to August 2, 1969, was $3.01 million. This language can be read to restrict redemption by Chadbourn subsidiaries only. Peat Marwick argues that the latter interpretation is correct and that Chadbourn itself was never under the terms of the Indenture restricted in its ability to redeem the preferred. There is evidence, however, that the Indenture was drawn with the intent to restrict redemption by Chadbourn. For example, Mr. Johnston, counsel for Chadbourn, disagreed with Peat on precisely this issue. He published a text in a note 8(d) of the financial statement contained in the 1971 Chadbourn Annual Report which indicated that the Indenture restrictions upon redemption also applied to Chadbourn. That footnote in pertinent part reads as follows:
 
 
 126
 (8) Long-Term Debt:
 
 
 127
 (d) The 61/2% debentures are . . .
 
 
 128
 Further, the indenture contains a restrictive provision under which the Company cannot declare any dividends or make any distribution (other than capital stock dividends), or acquire any of its stock if, after such action, the aggregate of all dividends (other than stock dividends), other distributions to stockholders and all amounts paid for the acquisition of its stock would exceed the sum of (i) $2,000,000 plus (ii) the net proceeds of the sale for cash by the Company of any shares of its capital stock after August 3, 1968 plus (iii) consolidated net income realized after August 3, 1968.
 
 
 129
 This same text was published in the 1972 and 1973 Chadbourn Annual Reports. These restrictions in effect limited the amount available for future dividends and future redemptions by Chadbourn to $2 million plus post-1969 earnings under the bank loan agreement, and $5.1 million plus post-1969 earnings under the Indenture. The promised redemption of the preferred from 1975 to 1979 would cost roughly $10 million if all of the preferred shareholders requested redemption. In the interim Chadbourn was obligated, inter alia, to pay the dividends on the preferred, to carry the debt service on the $12,631,000 Indenture, and to pay off the $6 million bank loan completely.
 
 
 130
 Chadbourn had to deal with approximately $18.5 million of new indebtedness before it could redeem plaintiffs' preferred as promised. Undisclosed was the fact that Chadbourn had to either earn approximately $16 million before taxes and $8 million after taxes, refinance the $18.5 million of indebtedness, or sell an additional $8 million of new equity securities.
 
 
 131
 It is clear that Peat had full knowledge of these restrictions when it prepared the Standard proxy financial statements and certified that the financial statements accurately described the financial condition and debt structure of Chadbourn. This certification was false and fraudulent as found by the District court. Furthermore, between March 23, 1970, and April 1, 1970, prior to the merger, Hugh Freeze, the Peat manager in charge of the Chadbourn audit, received a phone call from Chadbourn attorney Herbert Browne, Jr., a member of the law firm of Helms, Mullis & Johnston, the firm that prepared parts of the proxy. Brown informed Freeze that the use of the word "common" in footnote 7(c) of the Peat audit was erroneous. Freeze then crossed out the word "common" on his copy of a preliminary draft of the Standard proxy footnote and wrote the word 'capital' underneath it. Peat, however, did not alter the proxy, or, if the proxy had already been mailed, Peat took no steps to notify Standard shareholders or the SEC to correct the alleged error before the Standard shareholders voted on the acquisition of Standard by Chadbourn. The District Court could rightly infer that the reason Freeze did not correct the original was because it would have defeated the merger as the Standard shareholders would not have approved it.
 
 
 132
 There is other direct evidence that Peat had actual knowledge of the alleged error in footnote 7 of the proxy statement before the merger vote was taken. At approximately the same time it was preparing the Standard proxy Peat was also drafting a proxy containing the same financial statement for use in soliciting votes for the acquisition of Continental Strategics Corporation by Chadbourn (the Continental proxy materials). The Continental proxy, like the UHM proxy, contained the correct word "capital" in footnote 7(c). The Continental proxy was mailed on April 8, 1970, approximately two weeks before the vote on the Standard merger. The Continental proxy was not mailed to Standard shareholders because the Standard merger had not yet been consummated.
 
 
 133
 As indicated, supra, Peat also prepared the UHM proxy which contained the correct word "capital" in footnote 7(c). In a letter to the SEC dated April 20, 1970, two days before the Standard merger vote, counsel for Chadbourn sent to SEC copies of the UHM proxy containing the proper word.
 
 
 134
 Early drafts of the footnotes from the summer of 1969 when the audit was conducted indicate that Peat originally intended to disclose verbatim the Indenture restrictions on dividend payment. When the existence of the bank loan agreement for $6 million required a revision of the financial statement the following fall, Peat's auditing manager Freeze wrote footnote 7(c) using the word "common." For footnote 7(d) Freeze discarded the verbatim language of the Indenture restricting dividend payment and characterized the Indenture restrictive covenants as "less restrictive than those contained in the note agreement with the three banks." This characterization of the Indenture covenants appeared in all of the certified financial statements in issue until counsel for Chadbourn stated the Indenture dividend restriction in full in the 1971 Chadbourn Annual Report and stated the Indenture restrictions on redemption as well.
 
 
 135
 Despite all this evidence of deliberate fraud, Peat has the audacity to assert that the false, untrue and misleading statements in footnotes 7(c) and 7(d) of its audit were only "lapsus calami" (Br. at 5), "slip of the pen" (Br. at 29), and a "footnote mistake" (Br. at i). It is unbelievable that the majority of this panel would swallow with hook, line and sinker such an outrageous and ridiculous proposition and to hold that Peat's misrepresentation was only negligent and use it as a basis for reversing a well reasoned opinion of the District Court thereby depriving the many shareholders of Standard of millions of dollars of compensation in which they were justly entitled because of the fraud perpetrated on them by Peat. If it originally was only a slip of the pen, it became a deliberate fraud when Chadbourn's own lawyer called this to the attention of Peat's manager in charge of the audit and the manager corrected the alleged mistake in his copy and did not correct the original because it would have defeated the merger. The characterization of Peat's misrepresentation as a "negligent misrepresentation" adds something new and unheard of in our jurisprudence.
 
 
 136
 The District Court characterized it differently. It found that Peat's Certificate that it had performed its 1969 Chadbourn audit in accordance with generally accepted accounting standards and auditing practices and false and untrue and that Peat Acted "willfully, with intent to 'deceive' and 'manipulate' and 'in reckless disregard of the truth' in respect to footnotes 7(c) and 7(d) in said audit. In my opinion, the majorities holding should be rejected and the factual findings of the District Court upheld.
 
 
 137
 In imposing liability the District Court followed the standards of Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) with respect to the necessity of proof of scienter as mere negligence is not enough to violate the Act. The District Court in finding scienter stated:
 
 
 138
 (n)otwithstanding this stringent element of proof, the court concludes that in all the facts and circumstances of this case, scienter on behalf of defendant has been established by a preponderance of the evidence.
 
 
 139
 On two occasions when it counted most, with full knowledge of the correct term, Peat, deliberately, did not correctly describe the stock which was restricted in the payment of dividends by the bank loan which stock also was the particular class plaintiffs would receive by the merger. Furthermore, defendant never fully described either the dividend restrictions on preferred stock contained in the indenture or the redemption restrictions contained in the indenture or the redemption restrictions contained in the indenture and loan agreement. Defendant's agents documented Chadbourn's numerous edp defects at the time of the 1969 audit and approximately one year later some corrections had been made but a considerable number of deficiencies still remained yet defendant did not feel obliged to report this to plaintiffs. Finally with full knowledge of Chadbourn's deficient edp and other internal weaknesses, defendant conducted its 1969 audit as though Chadbourn was as sound as a dollar used to be clearly deviating from GAAP, GAAS and the provisions of Peat's own audit manual. The court finds and holds the proof in this case clearly established that, with the knowledge defendant possessed prior to, during and after the 1969 audit compared against the content of the (sic) Peat's 1969 Chadbourn financial statements, defendant acted willfully, with intent to "deceive" and "manipulate" and in "reckless disregard for the truth." App. 389a-90a.
 
 
 140
 Unlike the present case, in Ernst & Ernst, "the respondents specifically disclaimed the existence of fraud or intentional misconduct on the part of Ernst & Ernst." The Supreme Court did not determine whether reckless behavior is sufficient for civil liability under section 10(b) and Rule 10b-5.
 
 
 141
 In Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1024 (6th Cir. 1979), however, we upheld the sufficiency of recklessness to establish civil liability under the Act and that such claims should be liberally construed in order to effectuate the policies underlying the federal securities laws.[1]
 
 
 142
 The District Court was correct in finding that the deliberate misstatements and fraudulent omissions in the proxy statement were material. It is clear that no prudent Standard shareholder in his right mind would ever have voted for the merger if he had known of the restrictions on the payment of dividends and on the redemption of the cumulative preferred stock which he was to receive under the terms of the merger. The Standard stockholder had been receiving regular dividends on his Standard common stock. Because of the restrictions on the preferred stock which he was to receive in exchange he would not receive any dividends on the preferred stock for a long time and possibly he would never receive either the dividends or secure the redemption of the preferred shares. Under the law it was not necessary to prove that each shareholder of Standard relied on the representations contained in the proxy statement and financial statement mailed to them and to SEC. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384-85, 90 S.Ct. 616, 621-622, 24 L.Ed.2d 593 (1970). The majority opinion is inconsistent with the holdings in these cases and with the reasoning of the Supreme Court in Chiarella v. United States, --- U.S. ----, pages ---- - ----, 100 S.Ct. 1108, page 1115, 63 L.Ed.2d 348.
 
 
 143
 As before stated 22 percent of the outstanding Standard common shares was held in trust by a Knoxville bank in fiduciary accounts.
 
 
 144
 Because of the finding of liability by the District Court on the basis of section 10(b) of the Act and Rule 10b-5, I need not address the issues of Peat's liability under section 14(a) and Rule 14a-9, as an aider and abetter.
 
 
 145
 I also approve of the findings and conclusions of the District Court with respect to causation because materiality was established.
 
 
 146
 The majority does not discuss issues raised by Peat on the statute of limitations, damages and attorneys fees. I will therefore not discuss them.
 
 
 147
 In my opinion, the majority should have treated these matters so that it would not be necessary to remand the case to our court in the event the Supreme Court reversed this court on the issues of liability. This case has already been pending too long in the federal courts.
 
 II.
 
 148
 Although my dissent with respect to violations of section 10(b) of the Act and Rule 10b-5 is dispositive of the issue of liability, I also approve the findings and conclusions of the District Court as additional support with respect to Peat's false Certificate of the Chadbourn 1969 audit and the electronic data processing (edp).
 
 
 149
 The District Court found that Peat violated generally accepted auditing standards and generally accepted accounting principles (GAAS and GAAP) during the audit. Specifically, he found that Peat violated the following standards taken from Statements on Auditing Procedure No. 33 (SAP 33): the second and third general standards:
 
 
 150
 2. In all matters relating to the assignment an independence in mental attitude is to be maintained by the auditor or auditors.
 
 
 151
 3. Due professional care is to be exercised in the performance of the examination and the preparation of the report.
 
 
 152
 the second standard of field work:
 
 
 153
 There is to be proper study and evaluation of the existing internal control as a basis for reliance thereon and for the determination of the resultant extent of the tests to which auditing procedures are to be restricted.
 
 
 154
 the third standard of field work:
 
 
 155
 Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.
 
 
 156
 The Court further found Peat violated Statement on Auditing Procedure No. 41 (SAP 41), which sets forth a procedure for accountants to follow upon discovery of new material information to inform management and others known to be relying on such information. We believe that there is substantial evidence in the record to support such findings, and that they are not clearly erroneous. With respect to the conduct of the audit, no working papers exist to verify that important auditing steps were performed during the audit. Peat's valuation of Chadbourn's inventory was poorly performed. Peat's employee Marston's working papers on the efficacy of Chadbourn's internal controls stated, "(c)ontrols is out of control!" Two letters from Peat to Chadbourn dated September 17, 1969, and December 22, 1970, show that Chadbourn's electronic data processing (edp) problems were widespread and pervasive in all internal accounting systems, yet Peat failed to adequately take these problems into consideration, or to demand a full manual audit at financial year end, only one month later, as required by Peat's own audit manual; indeed, Peat instead relied upon Chadbourn's internal accounting systems to adjust the audit figures so that the financial statement read as of August 2, 1969, instead of July 4, 1969. With respect to the discovery of new material, Peat failed to inform the Standard shareholders of its footnote mistake in the financial statement even though Peat had full knowledge of the alleged mistake well before the merger vote and the accounting profession in SAP 41 specifically set forth a procedure for disseminating such information. Obviously Peat did not correct its mistake because if it had corrected it, Standard would have rejected the merger.
 
 
 157
 The court further found that Peat's failure to disclose dividend restrictions on payment thereof and redemption of the $.4622/3 preferred stock violated both Regulation S-X (Plf's Ex. 225-A) and Accounting Series Release No. 35. (Plf's Ex. 224).
 
 
 158
 James Quigley, a full partner of Peat's, admitted on cross-examination that it was mandatory that redemption restrictions be disclosed.
 
 
 159
 In arriving at its factual findings with respect to the audit, the materiality of the omissions and misrepresentations by Peat and in internal control, the District Court was supported by the testimony of Larry E. Rittenberg, as assistant professor, in the department of accounting of the University of Tennessee and George J. Benston, a distinguished professor of accounting and finance at the University of Rochester Graduate School of Management.
 
 
 160
 Professor Benston testified that Peat's footnote in the financial statement was incorrect because it did not disclose important aspects in the indenture and note agreement and violated Regulation S-X and Accounting Series Release No. 35.
 
 
 161
 Peat admitted it made a mistake but claimed it was inadvertent. The District Court found no mistake but a fraudulent omission of material facts. It was a fraud not only on Standard's stockholders but also on SEC.
 
 
 162
 The amicus brief of American Institute of Certified Public Accountants is noteworthy in its failure to discuss the main issue in this appeal, on which our decision is based, namely, the fraudulent footnote 7 of the Chadbourn financial statement contained in the Standard proxy materials written and certified as correct by Peat and mailed to Standard stockholders and filed with SEC. Instead, the Institute treats only one of the many issues in this case, namely, the liability of Peat for failure to disclose in its audit, weaknesses in the internal control of Chadbourn or require Chadbourn to make such disclosure.
 
 
 163
 If Peat desired to limit its liability it should have never attached to its audit the Certificate which it executed and was found by the District Court to be a false and fraudulent certification.
 
 
 164
 The District Court made a number of specific findings of fact with supporting record references with respect to Electronic Data Processing (EDP) deficiencies being Nos. 45 to 53 and held that Peat had a duty to disclose them to Standard's stockholders as prudent investors would be entitled to this information. Peat's failure to disclose this material information on its audit constituted a breach of duty of disclosure.
 
 
 165
 The District Court further made many specific findings of fact with supporting record references with respect to Generally Accepted Auditing Principles and Standards (GAAP and GAAS) being Nos. 54 to 102 from which it can be gleaned that the work performed by Peat was anything but a reliable audit. Finding (102) concludes: "The misrepresentation and omissions of defendant which have been fully documented in the Memorandum Decision and herein, were committed or omitted by Peat willfully, deliberately, with intent to deceive and manipulate and with reckless disregard for the truth."Conclusion
 
 
 166
 The requirement by law of the proxy statement with its certified audit and financial statement to be sent to the shareholders of an acquired company in a merger and filed with SEC, forms an important function for the protection of investors in the administration of the Securities Act by the Securities and Exchange Commission.
 
 
 167
 The Act can never be properly administered if deliberate, fraudulent, deceitful and recklessly made proxy statements such as were prepared by Peat for use in a corporate merger and for filing with SEC are ever tolerated. Its characterization by the majority as a "negligent misrepresentation" does not excuse the fraudulent omission by an auditor who owes a duty to disclose the truth. The District Court was correct in pointing out the many glaring deficiencies and fraudulent omissions in Peat's proxy statement and audit for which it was well paid. It should be required to compensate the victims of its frauds as ordered by the District Court.
 
 
 168
 The judgment of the District Court should be affirmed.
 
 WEICK, Circuit Judge, dissenting:
 
 169
 I respectfully dissent from the order denying en banc consideration of the petition for rehearing and from the denial of the petition for rehearing.
 
 
 170
 The Securities and Exchange Commission, the government agency in charge of and primarily responsible for administering the federal securities laws, including the Securities Exchange Act of 1934, has filed in this court, Memoranda, as amicus curiae, in support of the petition for rehearing en banc pointing out that the erroneous decision of the panel "will have serious adverse effects on both the enforcement of the federal securities laws by the Commission and on the maintenance of private rights of action under these laws."
 
 
 171
 On Page 3 of its Memorandum, the Commission states:
 
 
 172
 The Commission submits that the panel decision is premised upon two significant misperceptions concerning the culpability required to be shown in determining the liability of the accounting firm here under the federal securities laws:
 
 
 173
 1. The panel erred in defining "scienter" as meaning "a desire to deceive, defraud or manipulate" and in searching the record for evidence of a "motive for deception."
 
 
 174
 2. The panel erred in concluding that a showing of scienter was required as a prerequisite to recovery of damages in a private action under Section 14(a) of the Securities Exchange Act and Rule 14a-19 thereunder.
 
 
 175
 The Securities and Exchange Commission, the agency primarily responsible for administering the federal securities laws, including the Securities Exchange Act of 1934, is concerned that this decision will have serious adverse effects both on the enforcement of the federal securities laws by the Commission and on the maintence of private rights of action under these laws. Such private actions serve as a "necessary supplement" to the Commission's own enforcement activities and provide an essential means of redress for injured investors. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 382, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970); J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).
 
 On Pages 6 and 7 the Commission states:
 
 176
 The Commission supports the petition for rehearing and rehearing en banc on the question of the meaning of scienter because the Commission believes that the panel's erroneous scienter standard will significantly restrict the coverage of the federal securities laws and thus weaken the protections afforded to the investing public.
 
 
 177
 2. Assuming that even under the proper definition of the term scienter, the panel was correct in reversing the district court's finding that the accounting firm here acted with scienter, we believe that on rehearing this Court should also reconsider the panel's conclusion that a finding of scienter is required in order to prove a violation of Section 14(a) and Rule 14a-9. The panel decision, which is contrary to the authority on this issue, fails to recognize that, unlike Section 10(b), which the Supreme Court in Hochfelder read to require scienter, neither Section 14(a) nor Rule 14a-9 uses language which would even suggest a requirement that the violator must act with scienter.
 
 
 178
 Section 14(a) grants the Commission authority to prescribe rules relating to proxies as are "necessary or appropriate in the public interest or for the protection of investors * * *." Rule 14a-9(A) prohibits any proxy solicitation which is "false or misleading with respect to any material fact, or which omits to state any material fact" necessary to make statements not "false or misleading" or to correct earlier statements which have become "false or misleading."
 
 On Pages 8 and 9 the Commission concludes:
 
 179
 The panel, in concluding that scienter was required in order to hold the accounting firm liable under Section 14(a), placed particular emphasis on its perception of the firm's liability for the erroneous financial statements as being one of secondary liability. The panel thus appears to have viewed the theory of liability of the accounting firm here as that of an aider and abettor rather than that of a principal. That view, however, is erroneous. Indeed, in Securities and Exchange Commission v. Coffey, 493 F.2d 1304, 1315 n. 24 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975), this Court viewed an accountant who prepares a dishonest financial statement as a "primary participant in a violation" rather than a secondary participant. In any event, even assuming that liability here must rest on a theory of aiding and abetting, we believe that, rather than the scienter requirement adopted by the panel, a more appropriate analysis may be found in traditional concepts for secondary liability. Cf. Securities and Exchange Commission v. Coffey, supra, 493 F.2d at 1316; Securities and Exchange Commission v. Coven, 581 F.2d 1020, 1028 (2d Cir. 1978), cert. denied, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979); Securities and Exchange Commission v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975).
 
 
 180
 There can be no question but that the false and misleading audit certified by Peat violates Rule 14a-9(a) of the Commission.
 
 
 181
 It is noteworthy that the Commission calls attention to the fact that the panel opinion conflicts with our opinion in Securities and Exchange Commission v. Coffey, 493 F.2d 1304, 1315 n. 24 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975), which is in addition to the conflict with Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) and is contrary to the great weight of authority.
 
 
 182
 It is well settled that the interpretation of a statute by the agency charged with its administration is entitled to considerable weight. United States v. National Association of Security Dealers, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975), followed in Andrus v. Shell Oil Co., --- U. S. ----, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980, opinion written by Chief Justice Burger).
 
 
 183
 The panel made short shrift of the Commission's contentions by not even discussing them in its two line order denying the petition for rehearing which stated no reason.
 
 
 184
 The panel has introduced a new doctrine in securities law namely, of "negligent misrepresentations" which will relieve and exempt a dishonest auditor from legal liability not only from wrongful omissions of pertinent material matters which should have been included as being the very purpose of the audit, but also from the false and fraudulent certification attached to the audit.
 
 
 185
 In the present case, the victims of the fraud have been deprived of their judgments of restitution against the wrongdoer for over $4,000,000 by the misapplication of the securites law by the panel and its cavalier treatment of the factual findings of a distinguished district judge, which did not deserve that kind of treatment.
 
 
 
 [1]
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j(b) (1976).
 
 
 [2]
 It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title
 15 U.S.C. § 78n(a) (1976).
 
 
 [3]
 Employment of manipulative and deceptive devices
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. § 240.10b-5 (1979)
 
 
 [4]
 No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading
 
 
 [17]
 C.F.R. § 240.14a-9(a) (1979)
 
 
 [5]
 In August, 1967, at the beginning of Chadbourn's 1967-68 fiscal year, Chadbourn had retained earnings of $4.7 million. Its net earnings during the 1967-68 year were.$1.6 million so that retained earnings in August, 1968, at the beginning of the fiscal year 1968-69 were approximately $6.3 million. Its net earnings during the 1968-69 fiscal year were $3.1 million so that retained earnings in August, 1969, at the beginning of the 1969-70 fiscal year were approximately $9.3 million. At this time stockholder equity, consisting of total capital of approximately $18.3 million plus these retained earnings, was $27.7 million
 
 
 [6]
 Indeed section 18 of the 1934 Act, dealing with misstatements in reports filed with the SEC, requires both scienter and reliance for civil liability. Section 14 is much more similar to section 18 than it is to section 11 of the 1933 Act. Under the current regulatory scheme, proxy materials must be filed in advance of the solicitation with the SEC, see 17 C.F.R. § 240.14a-6, and are therefore subject to the provisions of section 18. In contrast, proxy solicitations per se do not put the solicitor within the ambit of section 11
 The District Court found that the plaintiffs could not recover under section 18 because they had not shown the reliance which is required by that section. This was, of course, true. At the same time, the defendants argue that the specific remedy provided by section 18 precludes implication of a cause of action under either section 10 or section 14, when the requirements of section 18 are not met. Only one circuit has directly discussed this question, finding that inability to satisfy the requirements of section 18 does not bar a less restrictive implied action brought under section 10, Ross v. A. H. Robins Co., Inc., 607 F.2d 545 (2d Cir. 1979). This question was not specifically addressed by the District Court and, because we find that in all events, the plaintiffs cannot recover under sections 10 or 14, we need not decide this question here.
 
 
 [7]
 The special meeting was called ostensibly to have the stockholders ratify the issuance of the shares of common stock used in connection with the Maister Laboratories, Inc., and Noxon, Inc., deal and the shares offered directly to stockholders
 The letter to the stockholders failed to disclose the action of the board of directors authorizing the underwriting of the shares of capital stock offered to the stockholders; failed to disclose the secret interest of the chairman of the board and other officers and directors of the corporation in the underwriting agreement; failed to disclose the actual assets or the value of the assets of the Maister Laboratories, Inc., or Noxon, Inc.; failed to disclose that the Maister Laboratories, Inc., and Noxon, Inc., were organized by two dummies of the president of the board; failed to disclose the existence of an option to Thomas E. Bragg for 25,000 shares of capital stock of the corporation at $18 per share; and failed to disclose that the president of the board and other officers and directors of the corporation were secret participants in a pool organized to operate under that option. The letter to the stockholders and the proxy requested the stockholders to ratify the acts of the very officers and directors who were betraying them by participating secretly in the underwriting agreement and pool operation, from which they obtained substantial profits. (footnotes omitted). Senate Committee on Banking & Currency, S.Rep. No. 1455, 73d Cong., 2d Sess. 75 (1934).
 
 
 [8]
 Pub.L. No. 90-439; 82 Stat. 454 (1968)
 
 
 [9]
 15 U.S.C. § 78n(e) (1976): Untrue statement of material fact with respect to tender offer :
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender, offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.
 
 
 [10]
 See AICPA, Statement on Auditing Procedure, No. 33 at 32 (1963); AICPA, Statement on Accounting Standards No. 1 §§ 320, 640 (1973); Carmichael, Opinions on Internal Control, Journal of Accountancy 47 (1970). The AICPA in 1977 promulgated a rule that disclosure to management was required. See AICPA, Statement on Accounting Standards No. 20 (1977)
 
 
 [11]
 Costs of sales = value of starting inventory k production costs incurred during fiscal year - value of closing inventory. See W. Conkling & P. Pacter, Attorney's Handbook of Accounting 5-29 (H. Sellin 2d ed. 1971)
 Net earnings = Gross sales - cost of sales.
 
 
 [12]
 Greige goods are unfinished, unshaped stockings
 
 
 [13]
 Again this assumes no exceptional production costs. No such exceptions are documented in the record
 
 
 [1]
 The majority opinion impliedly overrules our decision in Mansbach but this is not an uncommon practice in our court for one panel to overrule the decision of another panel. See article in Harvard Law Review Volume 92:931, 934, 935 on Appealability of Orders Relating to Ongoing Grand Jury Procedures. General Motors Corp. v. United States. Also as pointed out herein, the applicable decisions of the Supreme Court were not even followed