857 F.2d 179
 Fed. Sec. L. Rep. P 94,012, 26 Fed. R. Evid. Serv. 1224
Henry HERSKOWITZ, on behalf of himself and all others
similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Henry HERSKOWITZ, Appellant No. 87-1786.
Appeal of CONNECTICUT NATIONAL BANK, Cross-Appellant Nos.
87-1798 to 87-1803.
Alan ROSMAN, on behalf of himself and all others similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Alan ROSMAN, Appellant No. 87-1787.
Joseph FABIAN, on behalf of himself and all others similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Joseph FABIAN, Appellant No. 87-1788.
Nissim HUSNI, on behalf of himself and all others similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Nissim HUSNI, Appellant No. 87-1789.
Donald SUNSHINE, on behalf of himself and all others similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Donald SUNSHINE, Appellant No. 87-1790.
Jack POTOK, Fred Potok, Joint Tenants, on behalf of
themselves and all others similarly situated
v.
NUTRI/SYSTEM, INC., Harold Katz, A. Donald McCulloch, Jr.,
Albert J. Di Marco, Reef C. Ivey, II, Duane E. Jarvis,
Norman Amster, Martin S. Begun, Merrill Lynch Capital
Markets, Inc., Connecticut National Bank, John E. Sylvester,
Thomas W.L. Cameron.
Appeal of Jack POTOK and Fred Potok, Appellants No. 87-1791.
 Nos. 87 1786 to 87-1803
 United States Court of Appeals,
Third Circuit.
 Argued June 21, 1988.
Decided Sept. 13, 1988.
Rehearing and Rehearing In Banc Denied Oct. 11, 1988.
 
 Leonard Barrack, Sheldon L. Albert (argued), M. Richard Komins, Barrack, Rodos & Bacine, Philadelphia, Pa., for appellants/cross-appellees Henry Herskowitz, Alan Rosman, Joseph Fabian, Donald Sunshine, Jack Potok, Fred Potok.
 Barbara A. Podell, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for appellant Nissim Husni.
 Alexander Kerr (argued), Joseph G. DeRespino, Lisa M. Salazar, Hoyle, Morris & Kerr, Philadelphia, Pa., for appellee/cross-appellant Connecticut Nat. Bank.
 Roy H. Carlin, Clayton A. Prugh, Steven A. Samuel, Windels, Marx, Davies & Ives, New York City, for appellees, Nutri/System, Inc., A. Donald McCulloch, Jr., Albert J. Di Marco, Reef C. Ivey, II & John E. Sylvester.
 Theodore R. Mann (argued), Marc J. Zucker, Mann & Ungar, Philadelphia, Pa., for appellees Nutri/System, Inc., Harold Katz, Martin S. Begun & Thomas W.L. Cameron.
 Before GIBBONS, Chief Judge, and HIGGINBOTHAM and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge.
 
 
 1
 Shareholders of Nutri/System, Inc., who are plaintiffs in six consolidated class actions challenging the terms of a leveraged buyout, appeal from a judgment in favor of the defendants. The defendants include the Corporation, its senior management which purchased Nutri/System's business, its board of directors, and Connecticut National Bank, which issued an opinion letter on the fairness of the transaction. The shareholders challenged the leveraged buyout on the ground that its approval by shareholders was procured by use of a materially false and misleading proxy statement in violation of sections 10(b) and 14(a) of the Securities Exchange Act of 1934. 15 U.S.C. Secs. 78j(b) and 78n(a). They also alleged that the buyout was at an unfair price in violation of Pennsylvania law which breached fiduciary duties owed by its officer and directors to Nutri/System's public shareholders. Connecticut National Bank has filed a protective cross appeal contesting the standard of care on which the plaintiffs' claim against it was submitted to the jury. We conclude that two trial errors require a new trial. Since we will remand for a new trial it is appropriate to address and reject other claimed errors.
 
 
 2
 * Nutri/System, founded in 1972 by Harold Katz, operates and franchises weight-loss centers. From a single weight-loss center in Philadelphia, Nutri/System had grown by 1983 to a nationwide chain of 70 centers producing annual revenues of $133 million. In that year a secondary public stock offering was made by Katz, who retained a majority interest. Soon thereafter the company experienced a decline in its fortunes, including litigation with some of its franchisees. A settlement of this litigation reduced Nutri/System profits on sales of food products to franchisees, and competition in the industry put pressure on revenues. Katz decided to sell his share of the company in 1984. A proposed sale of the whole company to an acquisition group at approximately $9.00 a share ($90 million) fell through early in 1985, when the acquisition group was unable to obtain adequate financing. By the spring of 1985 the management was demoralized, and Nutri/System stock was trading at less than $4.00 a share.
 
 
 3
 In March 1985, Katz hired A. Donald McCulloch, Jr. as president of Nutri/System. McCulloch had a strong record in revitalizing other foundering companies, and he hired Albert J. Di Marco in marketing, Reef C. Ivey for administration and as General Counsel, and John E. Sylvester for operations. These three, with McCulloch, eventually made the leveraged buyout. During the negotiations with McCulloch over his employment, Katz promised that if he decided to sell Nutri/System McCulloch would have the right to make an offer.
 
 
 4
 In November 1985, Katz offered to sell Nutri/System to McCulloch's group for $70 million, which would yield approximately $7.00 a share for all shareholders. The stock was then selling at about $4.00 a share, no offers from outside the company were pending, and its business was still on a downtrend. Merrill Lynch Capital Markets was retained to provide financial advice and assistance in raising the cash which Katz desired. After performing a due diligence investigation, Merrill Lynch proposed in January 1986, that the transaction be financed by $40 million in senior notes financed by Merrill Lynch, $20 million in cash in the Nutri/System treasury, $10 million in subordinated debentures issued to the shareholders, and $5 million in equity funds invested by the McCulloch group. The purchasers and their wives were able to borrow $2 million on the security of their homes and other assets, but could not find venture capital for the $3 million shortfall. Merrill Lynch then restructured the transaction by increasing the senior note underwriting to $45 million, with detachable warrants entitling the senior noteholders to acquire 35% of the new company within five years. Under the restructured transaction existing Nutri/System shareholders would receive $7.16 a share.
 
 
 5
 In January 1986, the Company appointed Thomas Cameron and Dr. Martin Begun, the only two members of the board of directors not personally involved in the buyout, to investigate its fairness. Cameron and Begun retained Connecticut National Bank to prepare a fairness opinion on a negotiated fee for service basis. The agreement, according to the proxy statement, provided that Connecticut National Bank would receive $50 thousand for its opinion and an additional $25 thousand if it were published. To evaluate the fairness of the $7.16 a share price Connecticut National Bank made a discounted cash flow analysis in appraising Nutri/System's value. That analysis was based on cash flow projections made by the McCulloch group. Certain downward adjustments were made to the McCulloch group's projections to eliminate risks. Connecticut National Bank also assumed, for purposes of the discounted cash flow analysis, that Nutri/System's income would continue to be taxed for the next five years at the then-existing 46% corporate tax rate. In February of 1986, Connecticut National Bank issued a fairness opinion stating that the $7.16 a share price was fair to shareholders because the company was worth between $6.50 and $8.50 a share.
 
 
 6
 A proxy statement was filed with the Securities and Exchange Commission in April of 1986. After several revisions, it was mailed to Nutri/System's shareholders on July 11, 1986, for a vote at a shareholders meeting on August 6, 1986.
 
 
 7
 The shareholders' suit was filed on August 1, 1986, seeking preliminary and permanent injunctive relief against the leveraged buyout. A motion for a preliminary injunction against holding the shareholders meeting was denied. The shareholders voted overwhelmingly in favor of the proposed sale, and the leveraged buyout was closed on August 13, 1986.
 
 
 8
 Thereafter an amended complaint was filed and the case proceeded to trial before a jury. The district court during the trial precluded the shareholders from introducing any evidence relating to Nutri/System's performance following the buyout. Before submitting the case to the jury, the district court partially granted defendants' Fed.R.Civ.P. 50(a) motion by removing certain issues raised by the shareholders from consideration by the jury. The case was submitted to the jury on special verdict interrogatories the answers to which favored the defendants. Judgment was entered in favor of the defendants, and these appeals followed.
 
 II
 
 9
 While the shareholders claim numerous trial errors, we find only two which require a new trial.
 
 A.
 
 10
 The Directed Verdict on Use of a 46% Tax Rate Assumption
 
 
 11
 The parties agree that the district court in effect granted defendants a directed verdict on the shareholders' contention that in selecting to project a 46% tax rate for five years Connecticut National Bank made an unreasonable choice. A more realistic choice, according to the shareholders, would have produced a significantly higher projected cash flow and thus a significantly higher valuation than $7.16 a share. Under Fed.R.Civ.P. 50(a) a "directed verdict may be granted only if, as a matter of law, viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." Indian Coffee Corp. v. Procter & Gamble Co., 752 F.2d 891, 894 (3d Cir.), cert. denied, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985). There must be "sufficient evidence to submit to the jury for the purpose of resolving conflicts in the evidence or inferences permissibly drawn from the evidence, or both." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 116 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). This court exercises plenary review of the grant of a directed verdict. Indian Coffee Corp., 752 F.2d at 894; Finkle v. Gulf & Western Mfg. Co., 744 F.2d 1015, 1021 (3d Cir.1984).
 
 
 12
 An opinion or projection, like any other representation, will be deemed untrue for purposes of the federal securities laws if it is issued without reasonable genuine belief or if it has no basis. Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985). Accord, Gottreich v. San Francisco Investment Corp., 552 F.2d 866, 867 (9th Cir.1977) (treating as actionable an opinion without adequate or reasonable basis); S.E.C. v. Okin, 137 F.2d 862, 864 (2d Cir.1943) (treating as actionable an opinion for which there was "no ground"). Cf. First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir.1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); Marx v. Computer Sciences Corp., 507 F.2d 485, 489-90 (9th Cir.1974) (treating opinions as actionable where there was a gross disparity between them and the facts). The district court based its decision to remove the assumed tax rate issue from the jury on the fact that the proxy statement includes the following statement:
 
 
 13
 Pending or Proposed Tax Legislation. The United States Congress is currently considering various tax reform proposals. Among the various proposals are provisions which, if enacted, would reduce ordinary income tax rates for both individuals and corporations, increase tax rates on capital gains, and strengthen the minimum tax and alternative minimum tax. If any such legislation is enacted, whether such changes would affect particular items of income or loss discussed below could depend on the effective dates chosen by Congress.
 
 
 14
 Thus the district court based its ruling not on the reasonableness of Connecticut National Bank's projections in its fairness opinion, but on the disclosure in the proxy statement that the tax law might change. Concentrating on the notice of possible tax reform, the district court failed to address the separate issue of possible fraudulence in the fairness opinion itself. The fairness opinion had independent significance to shareholders, for it was obtained by the disinterested directors for the purpose of determining whether the offer from management was fair. It was, moreover, an opinion of an expert on valuation. Indeed, Connecticut National Bank impliedly recognizes that the district court's basis for removing the question from the jury is irrelevant, when it argues that "to overturn the trial court's directed verdict, plaintiffs must demonstrate that there was more than a scintilla of evidence that CNB either did not genuinely believe in the propriety of its use of a 46% tax rate in calculating the fairness of the $7.16 price per share offered by Nutri/System's management or that CNB had no sound factual or historical basis for the use of the 46% rate." Cross-Appellant's brief p. 36. Thus, we must examine the evidence presented by the stockholders on the reasonableness in July of 1986 of a projected cash flow valuation using the 46% tax rate assumption.
 
 
 15
 The shareholders' expert witness, John B. Torkelson, testified that it was inappropriate, in presenting a fairness opinion in July of 1986, to project a 46% effective tax rate over five years because "it was generally recognized by knowledgeable people in the field of financial analysis by July 1986 that the tax reform legislation pending before Congress was virtually certain to become law; that corporate income tax rates would be reduced to between 33 and 36 percent; and, that if CNB had used a tax rate in the 33 to 36 range in its discounted cash flow analysis, ... the range of values for the company would be from $7.58 to $10.35 per share," rather than a range which included $7.16. J.A. at 699, 2073. Torkelson pointed out that by the summer of 1986, "articles throughout the financial press were all saying the same thing, which is that the House bill is one rate, the Senate bill is another rate, they are extremely close, they are going to compromise and the bill will take effect on July of 1987." J.A. 739-40. Employees of the Connecticut National Bank who worked on the fairness opinion testified that they were aware of the impending tax reforms. J.A. at 891, 997, 1027. Nutri/System management in preparing its budget took into account the fact that tax rates would change effective July 1, 1987. Exhibit No. 29, J.A. 1912.
 
 
 16
 There was conflicting evidence as well. An employee of Connecticut National Bank, Kathy Fagan, noted the confusion and uncertainty surrounding the expected effects of tax reform, J.A. 996-97, and the fact that Nutri/Systems had paid in excess of a 46% rate over the prior five years when state and local taxes and amortization were included, J.A. 222. There was, moreover, evidence that Nutri/System paid total taxes amounting to 45% in the first year under the new tax law. J.A. at 743. The defendants urge that despite the evidence presented by the stockholders the conflicting evidence establishes as a matter of law that the fairness opinion is not actionable.
 
 
 17
 The opposing parties disagree over the meaning of the Eisenberg v. Gagnon test for the actionability of misrepresentations in an opinion or projection. The defendants contend that the shareholders cannot prevail unless they establish that there was no historical basis in fact for the 46% rate. If there is (and obviously there is), then Connecticut National Bank's decision to project that rate rather than others which might have been chosen for projection is unactionable as a matter of law. The shareholders, on the other hand, define the Eisenberg v. Gagnon issue as whether the selection of the 46% rate among others that could have been selected was reasonable in light of all the evidence, including expert opinion evidence that financial experts were at the time relying on a much lower projected tax rate.
 
 
 18
 In Eisenberg v. Gagnon we held that projections are actionable if "issued without a genuine belief or reasonable basis," 766 F.2d at 776, thus articulating both a subjective ("without genuine belief") and an objective (without "reasonable basis") test. Given that the test is intended to identify deviations from the appropriate standard of care in expressions of opinions by professionals "with greater access to information or having a special relationship to investors making use of the information," Eisenberg, 706 F.2d at 776, the more reasonable interpretation of the rule is that it permits recovery when an expert, in making a projection, adopts an assumption which the factfinder concludes was objectively unreasonable in the circumstances.
 
 
 19
 Applying the Eisenberg test to the evidence referred to above, we hold that it is sufficient to present a jury question as to whether it was reasonable for Connecticut National Bank to render a fairness opinion in July of 1986 based on a cash flow projection which assumed a 46% tax rate for the next five years. The court erred, therefore, in directing a verdict on this issue.
 
 B.
 
 20
 The Instruction on the Pendent State Law Claim.
 
 
 21
 The shareholders' pendent state law claim for breach of fiduciary duty asserts that if the jury found the consideration for the leveraged buyout to be in fact unfair, Pennsylvania law would permit recovery from the fiduciaries for their unfair self dealing. The court refused to instruct the jury to that effect, and the shareholders' objection to the instruction in this respect was preserved. J.A. at 1479. The defendants make two responses to this contention.
 
 
 22
 The first response is that the state law claims are not independent of the federal law claims which were decided in their favor because the shareholders allege no additional claims of bad faith beyond those litigated in the federal securities claims. We reject this response. The gravamen of the federal claims, for liability purposes, is inadequate disclosure. The gravamen of the state law claim pressed by the stockholders is unfair consideration resulting from self-dealing by fiduciaries. Clearly the jury did not reach and decide the question of fairness of the consideration in disposing of the federal non-disclosure issues. The defendants' second response is more troublesome, namely, that section 515 K of the Pennsylvania Business Corporation Law excludes any post-merger remedy other than an appraisal proceeding, including even a federal private right of action. Thus, defendants urge, even the section 10(b) and 14(a) federal claims should not have gone to the jury. The statute on which this response is predicated provides:
 
 
 23
 Any shareholder, who desires to object to, or dissent from, any proposed plan authorized under any section of this act, and where this act provides the shareholders so objecting or dissenting shall have the rights and remedies herein provided, shall be limited to the rights and remedies prescribed under this section, and the rights and remedies prescribed by this section shall be exclusive.
 
 
 24
 15 P.S. Sec. 1515 K (Purdon 1967). The rights and remedies referred to in section 515 K are the rights of dissenting shareholders to demand an appraisal of the fair value of their stock and to have it purchased by the corporation. The defendants interpret section 515 K to exclude all post-merger remedies, including remedies for misrepresentation and for breach of fiduciary duty.
 
 
 25
 We note that this action was commenced at the pre-merger stage, and that preliminary injunctive relief was denied on the ground that an adequate damage remedy could be fashioned for the shareholders. Another provision of the Pennsylvania Business Corporation Law provides that "a shareholder shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan ... or to claim the right to valuation of and payment of his shares ... except that he may dissent and claim payment if and to the extent provided in section 515 of this act...." 5 P.S. Sec. 1005 E (emphasis added). The Supreme Court of Pennsylvania construed this 1968 Amendment to the Business Corporation Law as a preservation, despite the exclusivity language in section 515 K, of the common law right of shareholders to enjoin proposed unfair or fraudulent corporate actions. In re Jones & Laughlin Steel Corp., 488 Pa. 524, 412 A.2d 1099, 1103-04 (1980) (citing Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (1955) and Weisbecker v. Hosiery Patents, Inc., 356 Pa. 244, 51 A.2d 811 (1947)). Thus the question presented is whether given the availability in Pennsylvania of suits to enjoin breaches of fiduciary duty, the Pennsylvania Supreme Court would construe section 515 K as prohibiting the other forms of relief such as rescission or money damages. To state the issue in terms with which corporate practitioners will be familiar: would the Supreme Court of Pennsylvania follow Weinberger v. UOP Inc., 457 A.2d 701 (Del.1983), the leading Delaware case on breach of fiduciary duty in a cash-out merger?
 
 
 26
 The defendants rely chiefly upon the superior court opinion In re Jones & Laughlin Steel Corp., 263 Pa.Super. 378, 398 A.2d 186 (Pa.Super.1979), which contains language possibly suggesting that the section 515 K appraisal right is exclusive of any other shareholder remedy. The holding of that case, however, is only that an appraisal court lacks jurisdiction to consider the fairness of the underlying merger. Indeed the case was before the superior court at an interlocutory stage pursuant to 12 P.S. Sec. 672 (Purdon 1967), which affords an appeal from an order involving questions of jurisdiction. That jurisdictional holding was affirmed by the Pennsylvania Supreme Court in In re Jones & Laughlin Steel Corp., 488 Pa. 524, 412 A.2d 1099 (1980), but as we note above the Pennsylvania Supreme Court took pains to point out that 15 P.S. Sec. 1005 E preserved shareholder remedies other than statutory appraisal. Moreover, although the Jones & Laughlin opinion on which the defendants rely was a section 515 post-merger appraisal suit, the underlying merger spawned, as here, a pre-merger shareholder class action seeking injunctive relief and/or damages. Tanzer Economic Associates, Inc. v. Haynie, 388 F.Supp. 365 (S.D.N.Y.1974) (refusing to grant requested injunction), 405 F.Supp. 650 (S.D.N.Y.1976) (refusing to dismiss complaint seeking damages). The Supreme Court of Pennsylvania noted the pendency of the Tanzer litigation, 412 A.2d at 1101, and by noting the propriety of a pre-merger lawsuit, preserved in 15 P.S. Sec. 1005 E, tacitly approved it. Eventually the Tanzer suit was settled, the settlement involved payment of damages, and in a subsequent stage of the Jones & Laughlin appraisal litigation the superior court made reference to it as follows:
 
 
 27
 The Tanzer litigation is to be contrasted to the appraisal claim under the Business Corporation Law--Rights of Dissenting Shareholders, where the only relief available is a "judgment against the corporation for the amount of the fair value of their shares...." 15 P.S. Sec. 1515(F). This limitation has been recognized by our Supreme Court in the present case upon prior appeal where it was determined that the appraisal remedy was the exclusive right which could be pursued in the present action. The court further recognized that dissenters could seek relief for unfair or fraudulent corporate actions in separate actions. See In re Jones & Laughlin Steel Corp., supra, 412 A.2d at 1103-04. Thus, our highest court has recognized in this very case that separate and distinct causes of action may be pursued as a result of the same purchase offer.
 
 
 28
 In re Jones & Laughlin Steel Corp., 328 Pa.Super. 442, 453, 477 A.2d 527, 532 (Pa.Super.1984). The unqualified statement about pursuing separate causes of action was made in the course of rejecting Jones & Laughlin's contention that by failing to opt out of the Tanzer class the appraisal plaintiffs were barred by res judicata. Thus it is a clear holding that in Pennsylvania the statutory appraisal cause of action coexists with common law causes of action. Indeed no other rule makes sense, for the appraisal remedy is available even absent misconduct of corporate officials. It was hardly enacted to provide a shield for such misconduct. We predict, therefore, that if faced with the issue the Pennsylvania Supreme Court would reject the defendants' interpretation of section 515 K as a bar to other causes of action for breach of fiduciary duty or misrepresentation in a cash-out merger.
 
 
 29
 Since the claim for breach of fiduciary duty by setting an unfair merger price was both separate from the federal non-disclosure claims and permitted under Pennsylvania law, the trial court erred in refusing to instruct the jury on that claim.
 
 III
 
 30
 Other errors claimed by the shareholders would not in our view require a new trial but are addressed here since the issues may reoccur.
 
 A.
 The Directed Verdict on the Pricing Issue
 
 31
 The shareholders contend that the proxy statement misrepresented the negotiations leading to the leveraged buyout by suggesting that the price was arrived at through arm's length negotiations, when in fact the terms and timing of the sales were dictated by Katz. The district court refused to submit to the jury the question of materiality of this alleged misrepresentation. J.A. 1211. Thus we must consider whether there was any evidence from which a jury could infer a material misrepresentation about the negotiations. The challenged language in the proxy statement reads:
 
 
 32
 During the summer and fall of 1985 Mr. McCulloch indicated to Mr. Katz that he and other members of senior management were interested in structuring a leveraged buyout of Nutri/System. Preliminary efforts to determine the availability of financing were also initiated. In November and December 1985 further discussions took place among Mr. McCulloch and other members of the Investor Group and their advisors and Mr. Katz and his advisors.
 
 
 33
 Proxy Statement p. 23, J.A. at 1523. The shareholders claim that the jury would, or at least could, read this passage to imply that an arm's length negotiation took place, when in fact Katz made a take-it-or-leave-it proposal.
 
 
 34
 There are two difficulties with the shareholders' contention. First, the quoted passage does not refer to negotiations, arm's length or otherwise, but to discussions; a generic term which no more suggests arm's length negotiations than it suggests self-dealing. Second, it is hard to imagine how a representation that arm's length negotiations took place between Katz and McCulloch would be material, in the required legal sense of importance to a reasonable shareholder in making a decision. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The principal ingredient in such a decision is fairness of the proposed price, and the relationship between the history of the negotiations and the fairness of the price is on this record simply too attenuated. Thus the district court properly refused to submit the "negotiations" issue to the jury. With other evidence of record than that which we review the question might appear differently.
 
 B.
 
 35
 Exclusion of Evidence of Post-Merger Performance
 
 
 36
 The shareholders sought to introduce evidence that Nutri/System's performance substantially exceeded the projections disclosed in the proxy statement during the first year after the leveraged buyout. Anticipating this evidence the defendants made a motion in limine to exclude it. The district court denied the motion without prejudice to its reconsideration, admitted it, but at the close of the testimony instructed the jury to disregard it. The shareholders contend that this ruling was error.
 
 
 37
 The shareholders do not contend that evidence of post-merger performance is relevant to the fairness of the Connecticut National Bank fairness opinion. They urge, however, that it is relevant (1) for the purpose of proving management's pre-merger intentions, and (2) for the purpose of proving the value of the shares at the time of the buyout. Since the district court effectively withdrew the common law breach of fiduciary duty claim from the jury, the second possible ground of relevance apparently was not considered. The court's discussion appears to focus on use of the post-merger performance as evidence of management's pre-merger intentions or expectations. While the evidence may have met the rather low threshold of relevance under Fed.Evid.R. 402, see Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66, 93 (E.D.N.Y.1969), modified on other grounds, 478 F.2d 1281 (2d Cir.1973), the court did not abuse its discretion in excluding it under Fed.Evid.R. 403 on the ground that the possible prejudice arising from use of events long after the preparation of the proxy statement to cast light on the defendants' earlier intention outweighed its limited probative value. See, e.g., Rovegno v. Geppert Bros., Inc., 677 F.2d 327, 329 (3d Cir.1982); United States v. Allessandrello, 637 F.2d 131, 146 (3d Cir.1980), cert. denied, 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981); United States v. Long, 574 F.2d 761, 767 (3d Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). Whether, on trial of the common law breach of fiduciary duty claim the evidence may be used to establish pre-merger value of Nutri/System is a different question. There is merit to the defendants' objection that post-merger performance is not a recognized method of proving value, at least absent evidence of obstacles to the use of other accepted methods of value such as market price, net asset value, and investment value. No such evidence appears in the present record.
 
 C.
 
 38
 The Wording of the Special Verdict Interrogatories
 
 
 39
 The shareholders contend that the district court committed prejudicial error in formulating special verdict interrogatories nos. 1, 2, 3 and 4. Under Fed.R.Civ.P. 49(a) they are deemed to have waived any objection to the interrogatories unless those objections are made known to the court before the jury retires. The record discloses no such objection to interrogatories nos. 1, 2, 3 and 4. Thus we can consider the objections now only if they rise to the level of plain error. Moreover use and form of interrogatories is a matter for discretion of the district court. McNally v. Nationwide Insurance Co., 815 F.2d 254, 266 (3d Cir.1987).
 
 
 40
 The shareholders' first objection is to interrogatory no. 1 which asks:
 
 
 41
 Did the proxy statement contain a misrepresentation of material fact because it included the fairness opinion of Connecticut National Bank?
 
 
 42
 The shareholders contend that this question is misleading in that it might confuse the jury on the standard of fraudulence of an opinion rather than of a fact. Their own proposed question, however, is no clearer in elucidating the fact-opinion distinction. We find no plain error.
 
 The second interrogatory asks:
 
 43
 Did the proxy statement contain an omission of material fact because it did not include the projections developed by A. Donald McCulloch, Jr. that included his prediction that there was a 55 percent chance of exceeding published figures by 20 percent?
 
 
 44
 The shareholders claim that this question assumes that the projection referred to is attributable only to McCulloch, not to the entire management group. We do not see any such defect. The evidence suggests that McCulloch made the projection. The jury was free, answering the question as worded, to decide whether the management should have disclosed it. That appears to have been the understanding of counsel for the shareholders at trial. J.A. at 1195-96. We find no plain error.
 
 The third and fourth interrogatories ask:
 
 45
 3. Does Exhibit P-24 accurately state a part of the contract between Connecticut National Bank and Nutri/System, Inc. concerning compensation to the bank for its services in rendering its fairness opinion?
 
 
 46
 4. Did the proxy statement contain an omission of material fact because it did not state the terms of the contract between Connecticut National Bank and Nutri/System, Inc. set forth in Exhibit P-24?
 
 
 47
 The shareholders claim that somehow these questions removed from the jury's consideration two questions: what was the real fee arrangement? and was it adequately disclosed? In light of the fact that Exhibit P-24 states that $25 thousand will be returned if the leveraged buyout does not close we are at a loss to see any defect, let alone plain error.
 
 D.
 Jury Instructions
 
 48
 With the exception of the instruction on the pendent state law claim, which was preserved, the defendants failed to preserve objections to the district court's jury instructions. Fed.R.Civ.P. 51. None of the objections pressed on appeal can be so regarded.
 
 IV.
 
 49
 In its protective cross appeal Connecticut National Bank contends that the trial court erred in instructing the jury on the standard of liability applicable under section 14(a) to an outside professional such as an investment banker rendering an opinion in connection with a merger. Since we are remanding for a new trial, it is appropriate to address that contention. Rhoads v. Ford Motor Co., 514 F.2d 931, 934 (3d Cir.1975). The bank's specific objection is to the court's instruction that "the intent to deceive or cheat" was not necessary to establish its liability. J.A. at 1458. The bank specifically requested a scienter charge.
 
 
 50
 Gould v. American-Hawaiian S.S. Co., 535 F.2d 761 (3d Cir.1976), which rejected the scienter requirement in cases under section 14(a), did not specifically address the liability of a bank that produces a fairness opinion. Gould did, however, on policy grounds, distinguish section 14(a) cases from those arising under section 10(b), under which a scienter charge is required, see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Gould, supra, 535 F.2d at 777-78. The Gould court analogized proxy statements to registration statements, both of which require careful disclosures to persons who are expected to act in reliance on the accuracy of those disclosures. Id. The test under section 14(a) is materiality of the disclosure. TSC Inc. v. Northway, Inc., 426 U.S. 438 (1976). A material misrepresentation even when made negligently rather than intentionally or recklessly, can still inflict the anticipated harm, and is thus deemed actionable.
 
 
 51
 In asking us to depart from the Gould standard for outside advisers such as accountants and investment bankers, Connecticut National Bank relies on Adams v. Standard Knitting Mills, Inc., 623 F.2d 422 (6th Cir.) cert. denied, 449 U.S. 1067, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980), which applied a scienter standard for an accountant who prepared a financial statement attached to a proxy statement. The reasoning of Adams, however, appears to be inconsistent with that of Gould, for it suggests that the scienter standard would apply in a section 14(a) case even for officers and directors. This panel is bound by Gould, which rejects the application of a scienter standard to such persons. Moreover since an investment banker rendering a fairness opinion in connection with a leveraged buyout knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs, we see no convincing reason for not holding it to the same standard of liability as the management it is assisting.
 
 V.
 
 52
 The judgment appealed from will be reversed, and the case remanded for a new trial.
 
 JAMES HUNTER, III, Circuit Judge: dissenting:
 
 53
 My colleagues would remand this case to determine whether defendant Connecticut National Bank (CNB) had a reasonable basis for selecting a 46% tax rate in calculating a five-year cash flow projection for Nutri/Systems. The parties do not dispute that use of the 46% rate was accurate under the tax laws as they existed at the time CNB gave its opinion. Thus, in rendering its fairness opinion, the bank did no more than rely on the law as it existed. Because I believe that CNB reasonably may rely on the law, I respectfully dissent.
 
 
 54
 The question before us is not whether the 46% rate was the only one that CNB reasonably could have chosen, but whether there was a reasonable basis for its choice. Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985). The majority holds that CNB may have acted unreasonably in relying on the existing tax rate because Congress was then working on major tax reform legislation which would lower the top marginal income tax rate for corporations. CNB had a more than ample basis for choosing the existing rate. The tax rate on which CNB relied was the law; there was no other law due to take effect. At the time of the fairness opinion, the tax reform law still was being considered by a joint committee of the House and Senate. It had been passed by neither body, nor signed by the President. This fact alone provides a sufficient reasonable basis for CNB's choice of tax rate.
 
 
 55
 Even had the lower rate been ready to take effect, CNB's choice of rate would be reasonable. Tax reform was predicted to extend far beyond tax rates. As the majority notes, there was substantial uncertainty about what the "bottom line" effect of all the changes would be. I cannot agree with the majority, however, that the securities laws required CNB to speculate on all the intricacies and effects of major legislation. Further, the cash flow projections extended over five years. Given the rising federal deficit and the several impending elections, CNB could not be certain that any lowered rate would not be increased within that five-year span. In the face of this uncertainty, the tax reform was being widely-publicized as "revenue neutral." This combination of factors provides CNB a reasonable basis to conclude that the existing 46% rate would not be far off the "bottom line" under the new laws.
 
 
 56
 I cannot agree that, by applying the law as written in making its projections, CNB acted without a reasonable basis for its opinion. I therefore dissent.